[No. 44845. En Banc. September 28, 1978.]

SEATTLE SCHOOL DISTRICT NO. 1, ET AL, *Respondents,* v. THE STATE OF WASHINGTON, ET AL, *Appellants.*

480

*Slade Gorton, Attorney General,* and *Timothy R. Malone* and *Richard A. Finnigan, Assistants,* for appellants.

*Gary M. Little, Foster, Pepper & Riviera, Camden M. Hall, Marco J. Magnano, Jr., Logerwell, Cohen & Andrews,* and *Michael E. Andrews (Arval A. Morris,* of counsel), for respondents.

*Will Knedlik* on behalf of John Bagnariol and Helen Sommers, amicus curiae.

STAFFORD, J.—This appeal arises from a judgment of the trial court declaring unconstitutional the State's reliance upon special excess levy funding for discharging its paramount duty to make ample provision for the education of its resident children as required by Const. art. 9, § 1. Respondents cross–appeal from the trial court's denial of requested attorneys' fees. We affirm in part and modify in part.

The factual and legal background of this appeal is exceedingly complex. The necessity of adequately touching upon the large number of critical and unique issues involved has caused this opinion to reach great length. For that reason we shall first summarize the primary matters discussed at greater length hereafter.

I. A declaratory judgment is peculiarly well suited to a judicial determination of controversies concerning constitutional rights and, as in this case, the constitutionality of legislative action or inaction under Const. art. 9, §§ 1 and 2. See page 489.

 The trial court is affirmed in its use of this remedy.

II. All respondents have standing to seek declaratory relief. See page 490.

 The trial court is affirmed.

III. Whether RCW 84.68 precludes judicial resolution of this action is not properly before us. See page 495.

The trial court is affirmed.

IV. It is a proper function of the judiciary to interpret, construe and enforce the constitution of the State of Washington. See page 496.

The trial court is affirmed.

V. Section 1 is not a mere preamble of Const. art. 9. Const. art. 9, § 1 is mandatory and imposes a judicially enforceable affirmative duty. See page 497.

The trial court is affirmed.

VI. Although Const. art. 9, §§ 1 and 2 are not self–executing, neither judicial construction and interpretation giving them substantive content nor the judicial enforcement thereof violates separation of powers. See page 504.

The trial court is affirmed.

VII. Const. art. 9, § 1 imposes a paramount duty upon the State which in turn creates a correlative right on behalf of all children residing within the borders of the state. See page 510.

The trial court is affirmed.

VIII. Const. art. 9, § 1 imposes upon the State the paramount duty of making ample provision for the education of all resident children. The Legislature may properly be left the obligation of implementing the State's mandatory duty. The Legislature must act to carry out its constitutional duty by defining and giving substantive content to "basic education" and a basic program of education. See page 514.

The trial court is affirmed.

IX. The State's affirmative paramount duty to make ample provision for the education of its resident children is a mandatory duty not limited to revenues derived from sources specified in Const. art. 9, §§ 3 and 5 and Const. art. 16. Rather, there can be compliance with the State's mandatory duty only if there are sufficient funds derived through dependable and regular tax sources to permit school districts to carry out a basic program of education. See page 520.

The trial court is affirmed.

X. The State has a mandatory duty to make ample provision for the basic education of all resident children through a general and uniform system. However, the ultimate obligation of giving effect to the mandate rests upon the Legislature. See page 523.

The trial court is affirmed.

XI. The statutory authorization of special excess levy elections for the purpose of meeting the State's mandated duty of making ample provision for "basic education" does not comply with Const. art. 9, §§ 1 and 2. However, special excess levies may be utilized to fund "enrichment programs" that go beyond the constitutional mandate. See page 524.

The trial court is affirmed.

XII. In the absence of special excess levies the State system of school funding does not make ample provision for the education of the children residing within respondent District and thus does not comply with Const. art. 9, § 1. See page 527.

The trial court is affirmed.

XIII. The Legislature has not expressly determined, in any current law, the level of funding or deployment

of resources which is fully sufficient to provide the mandated "basic education." See page 537.

The trial court is affirmed.

XIV. Special excess levies used to fund, in whole or in part, the "basic education" mandated by Const. art. 9, §§ 1 and 2 are unconstitutional. The Legislature has the duty to define "basic education" and to make ample provision for its funding by means of regular and dependable tax sources. The relief granted herein shall be prospective in nature so that obligations heretofore incurred shall not be impaired. Recognizing that the Legislature will need an adequate opportunity to respond to this decision, we modify the judgment of the trial court and extend the date for compliance from July 1, 1979, to July 1, 1981. See page 537.

The judgment of the trial court is affirmed in part and modified in part.

XV. We do not retain jurisdiction over the parties or the action being confident the Legislature will comply fully with its constitutionally mandated duty. Having declined to retain jurisdiction over the parties and the action, we also modify those portions of the judgment that deny "at this time" respondents' prayer for two writs of prohibition against expenditure of State funds and respondents' prayer for a judicially declared constitutional standard of "basic education." See page 538.

The judgment of the trial court is modified.

XVI. The trial court properly refused to award reasonable attorneys' fees to respondents. See page 539.

The trial court is affirmed.

The findings of fact demonstrate that Seattle School District No. 1 (District) must provide an educational program that complies with State statutes, regulations of the State Board of Education and the Superintendent of Public Instruction. Yet, while required to provide the program, the District is not given sufficient state revenue to do so. Rather, the Legislature has authorized school districts to supplement insufficient state funding by resort to special excess levy elections. This scheme merely authorizes a district to "seek" more adequate funding from the local electorate; but, the voters are not required to approve the request. A special excess levy election may not be brought more than twice in any one year. If the second request fails, the district must operate within the funds provided by the State.

School districts have no independent authority to raise funds necessary to fulfill their legal obligations. Consequently, school districts in general and the District in particular, have relied increasingly upon special excess levies to obtain funds necessary for their maintenance and operation budgets.

In 1975 the District twice submitted special excess levy proposals for the purpose of raising necessary additional revenue. As is true of most districts, the District did not base its levy request upon actual need. Rather, it sought a lesser amount believing it might attract voter approval. Although the amount requested, when added to the State guaranty, would not have provided full funding, both levy propositions failed. As a result, the District not only lost needed revenue, it incurred the heavy expense of twice placing the issue on the ballot. The District's experience was not unique. During the 1975–76 school year, 40 percent of the students in the state were in levy loss districts.

The findings of fact reveal that if special excess levies are utilized, in part, to provide for the maintenance and operation of a school district, a levy failure will adversely affect

the quality of education. It goes without saying that a *double* levy failure will severly damage a district's educational program.

Faced with a deteriorating physical plant, a reduction in budgets for books, supplies, staff and programs and a double levy failure, petitioners (respondents and cross–appellants herein) brought this action. The thrust of their claim was that the State had failed to discharge its "paramount duty" to make "ample provision for the education" of its resident children pursuant to Const. art. 9, § 1 and to "provide for a general and uniform system of public schools" pursuant to Const. art. 9, § 2.

The action originated in December 1975 in the Supreme Court as "Petitions for Mandamus, Prohibition and Declaratory Judgment." The original petitioners (respondents and cross–appellants herein) are the District; certain named voter–taxpayers in King County, some of whom are members of the District school board and all of whom are parents of minor children enrolled in and attending the District's schools; and children enrolled in the District as students.

The original respondents (appellants herein) are the State of Washington (State); the Speaker of the House of Representatives and the President of the Senate, as representatives and principal officers of the State House of Representatives and Senate (Legislature); the Superintendent of Public Instruction (SPI); the State Treasurer; and, each member of the State Board of Education (Board).

After a hearing, this court transferred the matter to the Superior Court for Thurston County for an expedited "resolution of all issues of fact and law." The case, as finally determined, was to be subject to direct appeal to the Supreme Court in accordance with appellate rules.

Prior to trial counsel stipulated that consideration of the issues surrounding the 1976–77 school year would be postponed pending determination of the issues involving the 1975–76 school year. Following approximately 9 weeks of trial, the trial court entered findings of fact, conclusions of

law and a judgment that may be characterized as a limited declaratory judgment coupled with a retention of jurisdiction to enforce it.

Specifically, the judgment declares that the District's children have a constitutional right to an adequately funded educational program of instruction. In addition it declares that the State, acting through the Legislature, is required by Const. art. 9, §§ 1 and 2, to fund, or provide dependable and regular tax sources for funding, a basic program of education, *i.e.*, it must make available that amount of funding necessary to "make ample provision for the education of all children residing within [this state's] borders . . ." It likewise declared unconstitutional the State's reliance, in whole or in part, upon a system of state funding which incorporates special excess levies as a part of the funding of "basic education," or the "basic program of education." Furthermore, it provides that special excess levies may only be used to fund "enriched programs," *i.e.*, educational programs which go beyond that required by Const. art. 9, § 1. In like manner the level of funding provided by the Legislature for the 1975–76 school year was declared insufficient to comply with the State's paramount duty under Const. art. 9, § 1. It also provided that reliance upon special excess levies for the financing of "basic education" must cease and that funds be made available from definite and certain sources to make ample provision for "basic education." The Legislature was granted until July 1, 1979, to enact the necessary legislation to fully comply with the mandate of Const. art. 9, § 1. Moreover, the trial court declared that it is the duty of the Legislature to fully implement Const. art. 9, §§ 1 and 2, and to that end it is to: (A) define "basic education" and determine the substantive content of the "basic program of education"; and (B) provide for the fully sufficient and ample funding of the program by appropriation *or* through regular and dependable tax sources.

The trial court retained jurisdiction of the action and over the parties to provide for necessary relief in the event

the Legislature failed to enact effective legislation in full compliance with Const. art. 9, §§ 1 and 2. The trial court also declared that the relief granted was prospective and was not to be construed as invalidating any acts taken or obligations incurred under existing statutes or regulations. Until July 1, 1979, all acts taken under existing statutes were deemed valid.

On the other hand, the trial court denied respondents' prayer for $17,000,000 damages for the 1975–76 school year and its petition for a writ of mandate directing the State Treasurer to provide the District with damages from state revenues. Additionally, it denied, "at this time," respondents' prayer for a writ of prohibition pertaining to the allocation of funds to local school districts and likewise denied respondents' prayer for a writ prohibiting the State Treasurer from disbursing state funds for any statutorily authorized purposes until supplemental funds were set aside for the operation of the District. The trial court denied, "at this time," respondents' prayer that the court establish, as a matter of constitutional law, the standard against which the substantive content of "basic education" could be measured in order to comply with Const. art. 9, § 1. Finally, the court denied respondents' prayer for reasonable attorneys' fees and costs other than those normally allowed by statute.

■■ Appellants have assigned error to 9 of 698 findings of fact. Except for numbers 172 and 446 no other finding is again referred to in appellants' brief by identifiable number or otherwise. Three other findings are mentioned without actual argument in the reply brief. Since there is no further argument, discussion or reference to these findings, we deem them abandoned. *Lassila v. Wenatchee,* 89 Wn.2d 804, 809, 576 P.2d 54 (1978); *State v. Wood,* 89 Wn.2d 97, 99, 569 P.2d 1148 (1977); *Pappas v. Hershberger,* 85 Wn.2d 152, 153, 530 P.2d 642 (1975). In any event, we have reviewed the record and are convinced that all challenged findings are supported by substantial evidence and none are mere conclusions of law. Such findings will not be

disturbed on appeal. *Lehmann v. Board of Trustees,* 89 Wn.2d 874, 576 P.2d 397 (1978); *Lassila v. Wenatchee, supra* at 810; *Rutcosky v. Tracy,* 89 Wn.2d 606, 609, 574 P.2d 382 (1978). Accordingly we must accept all 698 findings of fact as verities. *Seattle–First Nat'l Bank v. Brommers,* 89 Wn.2d 190, 199, 570 P.2d 1035 (1977); *Heggen Constr. Co. v. Turalba,* 88 Wn.2d 711, 716, 565 P.2d 420 (1977).

Appellants have assigned error to 41 of 102 conclusions of law and 37 of 42 paragraphs of the judgment. While a number of the matters to which error is assigned are clearly supported by findings of fact, other matters necessitate a detailed discussion of legal principles basic to this law suit. Thus, they will be dealt with in appropriate sections pertaining to the specific issues to which they are addressed.

Appellants raise a two–part threshold question. The first is concerned with respondents' use of declaratory judgment procedures to challenge the adequacy and constitutionality of the state system of school funding under Const. art. 9, §§ 1 and 2. The second is whether respondents have standing to challenge the constitutionality of the State's reliance upon a system of funding which depends, in whole or in part, upon special excess levies to "make ample provision for the education of all [resident] children."

I

*Use of a declaratory judgment to challenge the constitutionality of the legislation.*

Appellants appear to contend that it is improper for the District to seek declaratory relief against the State. It is pointed out that there must be a "justiciable controversy" as defined in *Diversified Indus. Dev. Corp. v. Ripley,* 82 Wn.2d 811, 815, 514 P.2d 137 (1973):

(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct

and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.

Appellants seem to suggest that element (2) is missing because the District is a mere corporate arm of the State, created for administration of the school system. Thus, they assert, the District and the State have identical interests which make declaratory relief inappropriate. We do not agree.

■ Where the question is one of great public interest and has been brought to the court's attention with adequate argument and briefing, and where it appears that an opinion of the court will be beneficial to the public and to other branches of the government, the court may exercise its discretion and render a declaratory judgment to resolve a question of constitutional interpretation. *State ex rel. Distilled Spirits Inst., Inc. v. Kinnear,* 80 Wn.2d 175, 178, 492 P.2d 1012 (1972). *See also Diversified Indus. Dev. Corp. v. Ripley, supra* at 814; *Huntamer v. Coe,* 40 Wn.2d 767, 246 P.2d 489 (1952).

Our review of the record and the briefs compels us to conclude that the Legislature, the Attorney General, school districts and the people of this State are uncertain as to the meaning and application of Const. art. 9, §§ 1 and 2. They, as well as the impacted public school children, will benefit from a clarification of the applicable constitutional and statutory provisions. Declaratory procedure is peculiarly well suited to the judicial determination of controversies concerning constitutional rights and, as in this case, the constitutionality of legislative action or inaction. *See Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977).

## II
### *Standing to seek declaratory relief.*

The unchallenged findings of fact disclose that one respondent is the District, a municipal corporation charged by state law with providing educational instruction for public school children in grades 1 through 12. Another

group of respondents includes taxpayer–parents of such children, all of whom are citizens of the State, own real property in King County, are registered voters within the District and some of whom are District board members. Finally, the children–respondents all reside within the District and attend public school therein.

Appellants assign error to the trial court's conclusion of law that the above–mentioned respondents have standing to contest the constitutionality of the school funding system. We find no error.

Appellants assert that the District lacks standing to seek the requested declaratory relief based solely upon one case. *Buse v. Smith,* 74 Wis. 2d 550, 247 N.W.2d 141 (1976). *Buse* involved a challenge to the validity of Wisconsin's system of school financing. However, the financing, statutory, and state constitutional requirements discussed therein are unlike those here. *Buse* involved a challenge to Wisconsin's "power–equalization" system under which local tax revenues were diverted from wealthy school districts to poorer districts in the form of, what was imaginatively called, "negative aid." Five school districts from which funds were diverted were petitioners along with taxpayers and parents of school children residing therein. The five districts were dismissed as parties but the taxpaying parents were left in the action.

*Buse* is neither factually nor legally controlling. First, "power–equalization" or "negative aid" is not employed in this state's system of school financing. Second, as pointed out in *Buse,* the five school districts concerned were not placed in a position of having insufficient funds. Rather, all five had sufficient funds for lawfully operating the required educational program. They merely challenged diversion of their tax revenues to other districts. Further, the *Buse* challenge involved a question of tax uniformity rather than a constitutional duty to make ample provision for education. Finally, the *Buse* court commented that school districts held power delegated to them by the legislature and thus lacked power to challenge the constitutionality of the

legislative acts "under the circumstances". But, it also noted that *there were exceptions* not relevant in *Buse,* at least one of which is applicable here. For example, Wisconsin recognizes an exception if the case presents an issue of great public concern. *Town of Germantown v. Village of Germantown,* 70 Wis. 2d 704, 235 N.W.2d 486 (1975). *See also Fulton Foundation v. Department of Taxation,* 13 Wis. 2d 1, 108 N.W.2d 312, 109 N.W.2d 285 (1961) in which the Wisconsin court specifically refers to this exception, relying on our own *Yelle v. Bishop,* 55 Wn.2d 286, 347 P.2d 1081 (1959).

It is difficult to imagine a greater interest in the outcome of litigation than that of respondent District. The current statutory system of school financing has been found insufficient to provide for the basic operation and maintenance of schools. Teaching staffs, educational programs and teaching materials are severely impacted. The failure of two special excess levy proposals has caused additional deferred plant maintenance, educational cutbacks and reductions in teaching staff. The latter fact alone has resulted in other school districts being sued by teachers separated from their positions. *For example, see Oak Harbor School Dist. v. Oak Harbor Educ. Ass'n,* 86 Wn.2d 497, 545 P.2d 1197 (1976); *Hill v. Dayton School Dist. 2,* 85 Wn.2d 204, 532 P.2d 1154 (1975); *Pierce v. Lake Stevens School Dist. 4,* 84 Wn.2d 772, 529 P.2d 810 (1974); *Thayer v. Anacortes School Dist.,* 81 Wn.2d 709, 504 P.2d 1130 (1972); and *Boyle v. Renton School Dist. 403,* 10 Wn. App. 523, 518 P.2d 221 (1974). Respondent Seattle School District No. 1 is in no different position. For example, see consolidated cases One Thousand Persons v. Seattle School Dist. No. 1 of King County; Adams v. Seattle School Dist. No. 1 of King County; and, Angevine v. Seattle School Dist. No. 1 of King County, King County cause Nos. 795080, 795060, and 795058 respectively. All concern actions in which the District paid judgments arising out of litigation precipitated by the District's double levy failures in 1975.

█ Past unrealistically strict considerations of "standing" have been eroded thus permitting broader factual "interests" to give rise to standing. *Association of Data Proc. Serv. Org'n, Inc. v. Camp,* 397 U.S. 150, 25 L. Ed. 2d 184, 90 S. Ct. 827 (1970); *Barlow v. Collins,* 397 U.S. 159, 25 L. Ed. 2d 192, 90 S. Ct. 832 (1970); *see also* K. Davis, *Administrative Law Treatise* 710 (Supp. 1970). In abandoning strict reliance upon the over legalistic "interest–right" test of standing, the United States Supreme Court commented in *Association of Data Proc. Serv. Org'n v. Camp, supra* at 153:

> The "legal interest" test goes to the merits. The question of standing is different. It concerns . . . the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

A review of our own cases involving claims by municipal corporations clearly demonstrates that we no longer consider standing an insurmountable barrier to reaching a decision on the merits when a municipal corporation challenges, as unconstitutional, a legislative act. *For example, see Moses Lake School Dist. 161 v. Big Bend Community College,* 81 Wn.2d 551, 503 P.2d 86 (1972); *Snohomish County Bd. of Equalization v. Department of Revenue,* 80 Wn.2d 262, 493 P.2d 1012 (1972).

Based on the more liberalized view of standing now recognized both by the United States Supreme Court and our own,[1] it is clear the District has standing to challenge the constitutionality of the school financing system. The interests of the District are not theoretical; they involve actual financial constraints imposed upon the District by the challenged system itself. In short, the interests sought to be protected by the District are within the zone of interest

---

[1]The extent to which this court has gone in liberalizing "standing" of interested persons or parties is demonstrated by our recent decision in *Loveless v. Yantis,* 82 Wn.2d 754, 513 P.2d 1023 (1973).

either regulated by the challenged regulations and legislation or by Const. art. 9, §§ 1 and 2. Under these circumstances it would be unreasonable to deny standing to the District which, far from being a nominal party, stands at the very vortex of the entire financing system.

The basic reason school districts exist is for the education of children through development and maintenance of schools and associated education programs. To that end school districts are authorized to "sue and be sued and to transact all business necessary for maintaining school and protecting the rights of.the district . ..." RCW 28A.58.010.

In considering the question of standing, what could be more fundamental to the maintenance of schools, and an educational program, than an action seeking to obtain sufficient revenue to keep a district operating with its basic programs intact so as to comply with the mandate of Const. art. 9, §§ 1 and 2? What could be more fundamental than respondent District's need for review of a system of public school financing that undermines its means of existence? When school districts are forced into litigation or potential litigation as parties defendant, how can it be said they lack sufficient interest to challenge the constitutionality of the very system of financing which forces them into that untenable position?

Having demonstrated sufficient factual injury and having shown that the interest to be protected is within the zone of interest protected by Const. art. 9, §§ 1 and 2, we hold the District has standing.

█ Appellants do not seriously challenge the standing of those respondents who are voter–taxpayers, some of whom are members of the District school board, and all of whom are parents of minor children attending public schools within the District. Other than mentioning the subject, the matter is not discussed and no authority has been cited on *this* issue of standing. The claimed error does not appear meritorious on its face. Thus, we will not consider it further. *Myers v. Harter,* 76 Wn.2d 772, 782, 459 P.2d 25 (1969); *Brown v. Quick Mix Co.,* 75 Wn.2d 833, 836, 454

P.2d 205 (1969); *State v. Robinson,* 75 Wn.2d 230, 234, 450 P.2d 180 (1969).

Appellants suggest that respondent children lack standing to seek declaratory relief challenging the State's system of school financing. Yet, all respondent children are residents of the state of Washington, live with their respondent parents within the District, and each is enrolled in and attends one of the public schools within the District.

At the outset it should be noted that Const. Art. 9, § 1, provides:

> It is the paramount duty of the state *to make ample provision for the education of all children residing within its borders . . .*

(Italics ours.) Clearly all respondent children fall within the zone of interest to be protected by the foregoing constitutional classification. They, of all people, are the intended and immediate objects of RCW Title 28A and WAC Title 180. Further, the adverse impact of insufficient revenue for the 1975–76 school year, as it relates to educational programs, is demonstrated by the findings of fact. Nevertheless, appellants challenge the children on the ground that "we do not know enough about them," *i.e.,* the children are challenged for what is *not* known about them rather than for what *is* known about them and their status as members of a class specifically recognized by the constitution and our statutes. While the negative approach is ingenious, it has little merit. Additionally, appellants have cited no authority to support this position. Consequently, we will not consider it further. *Myers v. Harter, supra; Brown v. Quick Mix Co., supra; State v. Robinson, supra.*

III

*Applicability of RCW 84.68.*

A final threshold question is raised by appellants' assignment of error to the trial court's determination that RCW 84.68.010–.150 does not preclude judicial resolution of this action. We do not reach the issue. Appellants did not address the question in their brief and did not cite to RCW

84.68 which deals generally with recovery of taxes paid, payment under protest and injunctions. Ordinarily we will not consider assignments of error on appeal if they are not supported by argument or authority. *Lassila v. Wenatchee, supra* at 809; *State v. Wood, supra* at 99; *Roberts v. Atlantic Richfield Co.*, 88 Wn.2d 887, 899, 568 P.2d 764 (1977). We see no reason to depart from this practice here.

IV

*Role of the court in constitutional interpretation and enforcement.*

 Appellants assign error to the trial court's conclusion that "[i]t is the proper function of this court to interpret and enforce the constitution of the State of Washington . . ." We do not agree. The ultimate power to interpret, construe and enforce the constitution of this State belongs to the judiciary. *Brownlee v. Clark,* 87 Wn.2d 478, 482, 553 P.2d 1344 (1976); *Haines v. Anaconda Aluminum Co.,* 87 Wn.2d 28, 34, 549 P.2d 13 (1976); *Plummer v. Gaines,* 70 Wn.2d 53, 58, 422 P.2d 17 (1966); *State Highway Comm'n v. Pacific N.W. Bell Tel. Co.,* 59 Wn.2d 216, 222, 367 P.2d 605 (1961). *See State ex rel. O'Connell v. Slavin,* 75 Wn.2d 554, 557, 452 P.2d 943 (1969); *State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 777, 380 P.2d 735 (1963). *See also Dyer v. Sims,* 341 U.S. 22, 28, 95 L. Ed. 713, 71 S. Ct. 557 (1950). As we said in *In re Juvenile Director,* 87 Wn.2d 232, 241, 552 P.2d 163 (1976):

> Both history and uncontradicted authority make clear that "'[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *United States v. Nixon* [418 U.S. 683, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974)], *supra* at 703, quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 60 (1803), even when that interpretation serves as a check on the activities of another branch or is contrary to the view of the constitution taken by another branch. *Powell v. McCormack,* 395 U.S. 486, 549, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969); *Tacoma v. O'Brien,* 85 Wn.2d 266, 534

P.2d 114 (1975). As stated in *Baker v. Carr,* 369 U.S. 186, 211, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962):

> Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

Further, the effect of a judicial interpretation of the constitution may not be modified or impaired in any way by the legislature. *See Haines v. Anaconda Aluminum Co., supra* at 34.

## V
### *The legal status of Const. art. 9, § 1.*

Appellants present a broad attack upon the trial court's use and application of Const. art. 9, § 1. Primarily they contend Const. art. 9, § 1 is a mere preamble, or policy declaration, which imposes no judicially enforceable affirmative duty upon either the legislative or executive branches of government. As a preamble, it is argued, the judiciary is without power to give Const. art. 9, § 1 substantive content. We do not agree.

A. Const. art. 9, § 1 is not a preamble.

Much of appellants' argument is based upon the *actual location* of section 1 within the education article. It is urged that since the section was placed first it is merely explanatory of objects sought to be accomplished by the balance of the article and thus must be a "preamble." Further, it is said support for this view exists because the codifiers have denominated the section a "Preamble" since 1897. However, these arguments ignore the explicit mandatory wording of section 1 and also beg the question.

Appellants support their "placement" argument by referring to the education articles of 13 other states.[2] In passing

---

[2]Cal. Const. art. 9, § 1; Ill. Const. art. 10, § 1; Iowa Const. art. 9, 2d § 3; Preamble to La. Const. art. 8; Me. Const. art. 8, § 1; Mass. Const. ch. V, § II; Mich.

we note that a section in one such article has been held to be a mere preamble without substantive effect.[3] But, the argument is not persuasive. Further, a careful review of the other education articles reveals that none is similar to Const. art. 9, § 1, which declares "It is the *paramount duty* of the state to make ample provision for the education of all children residing within its [the state's] borders . . ." (Italics ours.) For example, the constitutions of California, Iowa, Nevada, Michigan and North Carolina merely provide that education shall be *encouraged.* The Illinois, Louisiana and Montana constitutional provisions are equally inapposite, describing merely the *goal* of education. Massachusetts, New Hampshire and Tennessee's constitutions are equally irrelevant by referring to *cherishing* education. Rhode Island specifically makes it the duty of the general assembly to *promote* education and to adopt all means *which they may deem necessary* to secure the *advantages* of education. Maine's constitution *authorizes* the legislature to act and makes it their duty to require *towns* to make *suitable* provision "at their own expense."[4] Appellants' argument thus contains its own rebuttal. Clearly, Const. art. 9, § 1 is unique among state constitutions.

Const. art. 9, § 1 has not been amended since its adoption. Nothing contained therein or in the *Journal of the Washington State Constitutional Convention 1889* (1962) indicates that Const. art. 9, § 1 was intended to have the subordinate status of a mere preamble or that the language "paramount duty" was to be accorded anything less than its plain meaning. Unlike the hortatory language found in the education articles of other states, nothing in Const. art. 9, §

---

Const. art. 8, § 1; Mont. Const. art. 10, § 1(1); Nev. Const. art. 11, § 1; N.H. Const. part 2d, art. 83; N.C. Const. art. 9, § 1; R.I. Const. art. 12, § 1; Tenn. Const. art. 11, § 12.

[3]*Blase v. State,* 55 Ill. 2d 94, 302 N.W.2d 46 (1973).

[4]See footnote 2, above.

1 suggests that it does not actually declare the State's educational *duty*. Without question the language used by other states was before the drafters of our state constitution. But, it is significant that such vague laudatory language was rejected and the specific term *paramount duty* was adopted. There is no doubt the imperative wording of Const. art. 9, § 1 was intentional.

Appellants also attach importance to the fact that since 1897 the published version of Const. art. 9, § 1 has been entitled "preamble." We see no such significance. The original version of the constitution adopted in 1889 contained no titles or subtitles for articles, sections or subsections. It was not until 1897 that law book publishers volunteered titles for their own editorial purposes; and, it must be noted that these additions have changed from time to time.

We do not know from whence the title "preamble" was derived; but, the mere decision of an editor to volunteer captions for an otherwise untitled constitution deserves no weight in interpreting the instrument.

We also disagree with appellants' suggestion that the framers only intended that a "general and uniform" school system be provided. *See* Const. art. 9, § 2. Had this been their intent, it would have been unnecessary to use the words "ample provision" in section 1. Unlike other states, our constitution couples the State's "paramount duty" with the words "ample provision." The duty to make "ample provision", as opposed to merely providing for a "general and uniform" school system, is the *only* instance in which our constitution declares a specific state function to be a "paramount duty" of the State. Had the framers intended that the "paramount duty" was to provide a "general and uniform" school system, the constitution would have so provided.

Const. art. 9, § 1 does not merely seek to broadly declare policy, explain goals, or designate objectives to be accomplished. It is declarative of a constitutionally imposed *duty*. Thus, we hold that Const. art. 9, § 1 is not a "preamble".

Finally, appellants devote considerable space to the function and legal effect of a preamble. Having rejected appellants' argument that Const. art. 9, § 1 is a preamble, further argument based upon the rejected assumption is irrelevant.

B. Const. art. 9, § 1 is mandatory and imposes judicially enforceable affirmative duty.

Appellants urge that if Const. art. 9, § 1 is not a preamble, it at least is not mandatory and thus imposes no judicially enforceable affirmative duty. However, this contention directly contradicts Const. art. 1, § 29, which provides:

The provisions of this Constitution are *mandatory, unless by express* words they are *declared to be otherwise.*

(Italics ours.) The language of Const. art. 1, § 29 is clear and thus leaves no room for construction, interpolation or addition. *Anderson v. Chapman,* 86 Wn.2d 189, 543 P.2d 229 (1975); *State ex rel. O'Connell v. Slavin,* 75 Wn.2d 554, 452 P.2d 943 (1969); *State ex rel. Swan v. Jones,* 47 Wn.2d 718, 289 P.2d 982 (1955). Since this provision is clear and unambiguous, it has been the subject of few judicial comments. *Anderson v. Chapman, supra* at 192; *State ex rel. Lemon v. Langlie,* 45 Wn.2d 82, 97, 273 P.2d 464 (1954); *State ex rel. Washington Nav. Co. v. Pierce County,* 184 Wash. 414, 423, 51 P.2d 407 (1935); *State ex rel. Smith v. Neal,* 25 Wash. 264, 265, 65 P. 188 (1901). There being nothing in Const. art. 9, § 1 expressly declaring otherwise, we must assume that it *is* mandatory.[5] *Anderson v. Chapman, supra* at 192; *State ex rel. Billington v. Sinclair,* 28 Wn.2d 575, 581, 183 P.2d 813 (1947); Const. art. 1, § 29.

---

[5]Some rather interesting light is shed upon the purpose of Const. art. 1, § 29 which declares all provisions of the constitution mandatory, unless expressly declared to be otherwise. In 4 Wash. Hist. Q. 281, 286 (1913), Theodore L. Stiles, a member of the constitutional convention and one of the first justices of this court said:

There have been some excellent provisions in the Constitution from which the people have had no benefit, because they depend for operation upon action

Appellants argue, however, that even if Const. art. 9, § 1 is mandatory it imposes no judicially enforceable affirmative duty because the command is directed solely to the Legislature. Appellants assert that the sole remedy for breach of such a duty lies with the voters. In short, the remedy is said to be political not judicial.

Appellants' argument assumes, as it must, that Const. Art. 9, § 1 is directed to the Legislature. *Based upon that assumption* the contention appears to find some support in the case law that culminates in *Gottstein v. Lister,* 88 Wash. 462, 153 P. 595 (1915). But, as shall be discussed in Sections VI and VIII below, the constitutional command of Const. art. 9, § 1 is *not* directed solely to the Legislature.

Without question we held in *Gottstein* that Const. art. 1, § 29 falls short of solving the problem in cases similar to *Gottstein* and that in such situations it would be a mistake to assume only the courts can be relied on as guardians of the constitution. However, despite the broad language of *Gottstein,* that case also recognizes an exception extremely relevant here. At page 493 we said:

> Of course, *when it comes to considering individual rights such as* are protected by the guaranties, that the *right to trial by jury* shall remain inviolate; that *no person shall be deprived of life, liberty or property without due process of law; that no law shall grant to any citizen or class of citizens privileges or immunities* which upon the same terms shall not equally belong to all citizens; *and many other constitutional guaranties that look to protection of personal rights, the courts have ample power,* and will go to any length within the limits of judicial procedure, *to protect such constitutional guaranties.*
> But in that large field of governmental activity having to do with public affairs only, there are many things that might be done or left undone in derogation of mandatory

by the legislature, and that body has neglected to do its duty in the premises. *Considering that by section 29 of the first article every direction contained in the constitution is mandatory unless expressly declared to be otherwise, it is at least surprising that in some instances no attempt has been made whatever to set these provisions at their legitimate work.*
(Italics ours.)

constitutional provisions which the courts would be powerless to correct.

(Italics ours.) We thus recognized that the judiciary has ample power to protect constitutional provisions that look to protection of personal "guaranties." While *Gottstein* has specifically enumerated some, we also recognized the existence of many others. In this regard we could have then added the affirmatively stated personal guaranties expressed in Const. art. 1, § 5, freedom of speech; Const. art. 1, § 11, freedom of religion; Const. art. 1, § 19, freedom of election; as well as the constitutional rights expressed in Const. art. 1, § 20, authorization for bail; Const. art. 1, § 10, entitlement to public trial; and Const. art. 1, § 22, the right of an accused to appear and defend in person. At this late date in our judicial history we doubt that one could seriously contend any of the foregoing do not set forth judicially enforceable affirmative duties of the State.[6] Equally illogical would be a rule that a mandatory constitutional provision placing an affirmative "paramount duty" on the State to "make ample provision for the education" of a specific class of citizens is not judicially enforceable. If our exception in *Gottstein* stands for anything, it recognizes the need to protect those constitutional guaranties of a per-

---

[6]It is of interest that appellants would attempt to belittle the importance of judicial action in the constitutional areas enunciated. For example, it appears to be suggested that "of course" they are unquestionably addressed to the judiciary and are to be implemented by the judiciary. Thus, it is said that even though stated affirmatively they have an important negative aspect and thus are conditional in nature. So, if the State fails to provide the constitutionally required public trial, jury, bail or free counsel the negative conditional nature of the constitutional provision authorizes the court to inject itself as it would in the case of self–executing provisions. This merely ignores the role of judicial interpretation. Nothing in the constitution suggests that these enumerated constitutional sections are "unquestionably" addressed to the judiciary. They are so treated by reason of *judicial interpretation,* a fact appellants ignore. Nothing in the constitution suggests that although stated affirmatively these constitutional sections are in fact negative and conditional in nature, unless that result is achieved solely by *judicial interpretation;* again, a fact that appellants ignore. In fact, the judiciary can and does enforce these provisions based upon a longstanding *interpretation* that the power so to do rests with the judiciary.

sonal nature.[7] Const. art. 9, §§ 1 and 2 reflect such a right.[8] Appellants' argument that any breach of the duty imposed by Const. art. 9, § 1 requires political rather than judicial resolution is incorrect for another reason. As indicated previously, all parties agree that Const. art. 9, § 1 is in need of both interpretation and construction, *i.e.*, a determination of the sense and meaning of the words used in the section as well as the legal effect and consequence of the section itself. The real dispute stems from a disagreement over which governmental body has the power to interpret and construe the constitution. In this respect, appellants argue that Const. art. 9, § 1 is merely a statement of *moral* principle and that it is the sole prerogative of the Legislature to interpret, construe and give it substantive content. We disagree. As we stated in Section IV, the judiciary has the ultimate power and the duty to interpret, construe and give meaning to words, sections and articles of the constitution. *Haines v. Anaconda Aluminum Co.*, 87 Wn.2d 28, 549 P.2d 13 (1976); *Plummer v. Gaines*, 70 Wn.2d 53, 422 P.2d 17 (1966); *State Highway Comm'n v. Pacific N.W. Bell Tel. Co.*, 59 Wn.2d 216, 367 P.2d 605 (1961); *see State ex rel. Humiston v. Meyers*, 61 Wn.2d 772, 380 P.2d 735 (1963); *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 452 P.2d 943 (1969); *see also Dyer v. Sims*, 341 U.S. 22, 95 L. Ed. 713, 71 S. Ct. 557 (1950). It is

[7]The power of the judiciary to enforce rights recognized by the constitution, even in the absence of implementing legislation, is clear. *See King v. South Jersey Nat'l Bank*, 66 N.J. 161, 330 A.2d 1, 9–10 (1974); *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273 (1973), *cert. denied, Dickey v. Robinson*, 414 U.S. 976, 38 L. Ed. 2d 219, 94 S. Ct. 292 (1973); *Cooper v. Nutley Sun Printing Co.*, 36 N.J. 189, 196, 175 A.2d 639 (1961). Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail mandatory provisions by its silence. The judicial obligation to protect constitutionally declared fundamental rights of individuals is as old as the United States. *See Marbury v. Madison*, 5 U.S (1 Cranch) 137, 163, 2 L. Ed. 60, 69 (1893).

[8]In this regard we note that RCW 28A.13.005 refers to the existence of such a constitutional right by providing that all handicapped children shall have the opportunity for an appropriate education "as guaranteed to them by the constitution of the State."

emphatically the province and duty of the judicial department to say what the law is. *United States v. Nixon,* 418 U.S. 683, 703, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803). This duty must be exercised even when an interpretation serves as a check on the activities of another branch of government or is contrary to the view of the constitution taken by another branch. *In re Juvenile Director,* 87 Wn.2d 232, 241, 552 P.2d 163 (1976); *Powell v. McCormack,* 395 U.S. 486, 549, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969).

Once it has been determined that the court has the power or the duty to construe or interpret words or phrases in the constitution and to give them meaning and effect by construction, it becomes a judicial issue rather than a matter to be left to legislative discretion.

## VI
### *Separation of powers.*

Appellants assert that since Const. art. 9, §§ 1 and 2 are not self–executing, any judicial enforcement thereof or any attempt to give them substantive content would violate the doctrine of separation of powers. We do not agree.

As we said in Sections IV and V, interpretation and construction of the constitution are exclusively judicial functions. Further, as pointed out in Section V, Const. art. 9, §§ 1 and 2 require judicial interpretation and construction to give them proper meaning and scope. Moreover, as stated in *Baker v. Carr,* 369 U.S. 186, 211, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962):

> Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

Once it is determined that judicial interpretation and construction are required, there remains no separation of

powers issue. Thereafter, the matter is strictly one of judicial *discretion*. In such a case and after a judicial determination therein, the legislature must subsequently act within the confines of the judicial interpretation. *See Plummer v. Gaines, supra; State Highway Comm'n v. Pacific N.W. Bell Tel. Co., supra.* This is altogether different from the constitutional requirement of *initial* and *total* judicial abstention for which appellants opt.

In this vein we note even appellants concede the judiciary has *some* power to act. They first suggest the judiciary should inject itself herein *only if the legal grounds for so doing are absolutely compelling.* Again, in oral argument they maintained the judiciary should refrain from acting *unless things become bad enough.* Clearly, these arguments are not addressed to a "separation of powers" question. Rather, they are directed at *judicial restraint.* To acknowledge that the judiciary may act in compelling or exigent circumstances is to concede that it actually has the *power* to act. That being true, there is no "separation of powers" issue.

At this juncture we also consider *Marbury v. Madison, supra,* wherein the United States Supreme Court first dealt with the basic powers and duties of the judiciary. Faced with a Congressional declaration of executive authority and an attempt to extend judicial power beyond that provided by the United States Constitution, Chief Justice Marshall said that the judiciary, not Congress, was the branch of government empowered to interpret the constitution. In short, Chief Justice Marshall declared that the judiciary was supreme in the area of constitutional interpretation, declaration of legal duties thereunder, and the application thereof. It is of interest that appellants do not contend that *Marbury* was wrong or that it should be disregarded after 175 years. Rather, they concede that the statement of principle has been validated by history.

Nevertheless, we are sensitive to the fact that our state government is divided into legislative, executive and judicial branches with the sovereign powers allocated among

the co-equal branches. We are equally aware that those charged with the exercise of power in one branch must not encroach upon power exercisable by another. But, the compartments of government are not rigid. In fact, the practicalities of government require that each branch take into account the power of the others. None was intended to operate with absolute independence. *Moran v. State,* 88 Wn.2d 867, 873, 568 P.2d 758 (1977); *In re Juvenile Director, supra; United States v. Nixon,* 418 U.S. 683, 707, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974). Recognition of this fact is particularly important where, as here, Const. art. 9, § 1 is addressed to the "State" *not merely to the Legislature.* Thus, all three branches of government are charged by the constitutional command and with the mandatory provisions of Const. art. 1, § 29. In addition, the judiciary is charged by Const. art. 4 *to exercise* the judicial power which, as we said, includes interpretation and construction of the constitution itself.

We cannot abdicate our judicial duty to interpret and construe Const. art. 9, §§ 1 and 2 merely because, as appellants seem to suggest, we lack apparent available physical power. We do not see the threat of confrontation visualized by appellants. To the contrary, we are firmly convinced the other branches of government also will carry out their defined constitutional duties in good faith and in a completely responsible manner.

Judge Sirica was faced with a similar "power" argument by counsel for Richard Nixon, then President of the United States. In *In re Grand Jury Subpoena to Nixon,* 360 F. Supp. 1, 9 (D.D.C. 1973), he said:

> That the Court has not the physical power to enforce its order . . . is immaterial to a resolution of the issues. Regardless of its physical power to enforce them, the Court has a duty to issue appropriate orders. . . . *[I]t would tarnish the Court's reputation to fail to do what it could in pursuit of justice.* In any case, the courts have always enjoyed the good faith of the Executive Branch . . . and *there is no reason to suppose that the courts in this instance cannot again rely on that same good faith.*

(Footnotes omitted. Italics ours.) On appeal the Circuit Court had this further comment in *Nixon v. Sirica,* 487 F.2d 700, 711-12 (D.C. Cir. 1973):

> The legality of judicial orders should not be confused with the legal consequences of their breach; for the courts . . . always assume that their orders will be obeyed, especially when addressed to responsible government officials.

The action taken in *In re Grand Jury Subpoena to Nixon,* *supra,* and *Nixon v. Sirica, supra,* was affirmed in *United States v. Nixon, supra.*

The foregoing principles apply with equal force to apparent conflicts between the judicial and legislative branches. *See, e.g., Powell v. McCormack,* 395 U.S. 486, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969). In *Powell* the issue was whether Congress had wrongfully excluded Adam Clayton Powell from its membership. At stake was the power of the United States Supreme Court to interpret and enforce rights under article 1, section 5 of the United States Constitution which reads:

> Each house shall be the judge of the . . . qualifications of its own members . . .

As with our own Const. art. 9, §§ 1 and 2, counsel in *Powell* strenuously argued that affirmative action by the judiciary would produce a potentially embarrassing confrontation between coordinate branches of the federal government, *i.e.,* with Congress. *Powell v. McCormack, supra* at 548. Although the problem in *Powell* was more clearly evident than here, the Supreme Court did not hesitate to assume its proper role. It said at pages 548–49:

> But, as our interpretation of Art. I, § 5, discloses, a determination of petitioner Powell's right to sit would require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a "lack of the respect due [a] coordinate [branch] of government," nor does it involve an "initial policy determination of a kind clearly for nonjudicial discretion." *Baker v. Carr,* 369 U.S. 186, at 217. Our system of

government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.

In like manner, this court cannot fail to act. Interpretation and construction of Const. art. 9, §§ 1 and 2 are traditional judicial functions and involve no disregard for or lack of respect due a coordinate branch of government. While the judiciary occasionally may find it necessary to interpret the State Constitution in a manner at variance with a construction given it by another branch, the cry of alleged "conflict" cannot justify courts avoiding their constitutional responsibility. *Powell v. McCormack, supra* at 548–49.

Appellants also suggest Judge Hoyt's opinion in *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 P. 201 (1893), merits special consideration in the separation of powers area because he and the concurring judges, Dunbar and Stiles, were members of the State's constitutional convention. We disagree.

Somewhat similar reasoning was rejected as early as 1803 in *Marbury v. Madison, supra.* In *Marbury,* the challenged legislation was enacted by a congress populated by numerous framers of the federal constitution. Thus, it was argued, the intent of the drafters of the Constitution *must have been accurately expressed* in the challenged legislation. The *Marbury* court disagreed and held the act of Congress unconstitutional. While we recognize that the former framers in *Marbury* were *Congressmen* and that those referred to here are *judges,* appellants' argument is entitled to no greater weight than it was in 1803.

The fact that the three judges were former members of the constitutional convention furnishes no insight to our consideration of the separation of powers issue. Moreover, a careful review of *Reed* reveals that Judge Hoyt claimed no ability or intent to do so. Consequently, we reject appellants' contention that *Reed* expresses the intent

of the framers of our Constitution. Further, despite appellants' assertions to the contrary, we find that these former constitutional draftsmen also expressed no helpful view on "separation of powers" in either *Anderson v. Whatcom County,* 15 Wash. 47, 45 P. 665 (1896) or *State ex rel. Spokane & British Columbia Tel. & Tel. Co. v. Spokane,* 24 Wash. 53, 63 P. 1116 (1901). Neither actually discusses the "separation of powers" concept. At best, they touch upon it only indirectly and then only in a conclusory manner.

Turning again to *Reed,* we note that although it discusses "separation of powers" it is not a "separation of powers" case. Primarily, *Reed* is concerned with the "enrolled bill doctrine" and the type of presumption to be accorded an enrolled bill. Since we are not here concerned with that doctrine, *Reed* is not in point.

Further, at page 457, *Reed* recognizes that the "enrolled bill doctrine" may be employed if it can be done "without violating some fundamental constitutional provision or well settled rule of construction." It is of interest, however, that *Reed* does not thereby exclude judicial action. Rather, it recognizes that whether a constitutional provision or a rule of construction has been violated is a judicial function. Thus, in the final analysis even *Reed* would acknowledge that the threshold question, *e.g.,* whether the doctrine may be employed, must be decided by the judiciary.

One of our latest discussions of constitutional *interpretation* and *construction,* as well as the judicial *power* and *duty* to render a declaratory judgment to resolve constitutional questions, is found in *State ex rel. Distilled Spirits Inst., Inc. v. Kinnear,* 80 Wn.2d 175, 178, 492 P.2d 1012 (1972). The principal issue concerned the interpretation of Const. art. 2, § 12, *i.e.,* whether extraordinary legislative sessions are limited to 60 calendar days. We held that Const. art. 2, § 12 contains no such limitation. However, we also made another determination singularly applicable to this case. We held that the judiciary has the *power* and it is

its *duty,* in a case properly presented, to *construe the provisions of the constitution.*

Consequently, we hold that the trial court's interpretation and construction of Const. art. 9, §§ 1 and 2, as well as its subsequent application thereof to pertinent legislative enactments, does not violate separation of powers principles. In addition, the judgment as subsequently modified herein does not violate the doctrine of separation of powers. Such determinations fall within the traditional role accorded the judiciary to interpret and construe the constitution and involves no lack of respect due a coordinate branch of government. It is the constitutional exercise of a legitimate judicial duty.

## VII

*Const. art. 9, § 1 imposes a paramount duty upon the State which in turn creates a correlative right on behalf of all resident children.*

Const. art. 9, § 1 which stands at the vortex of the entire dispute is unique. It reads in part as follows:

It is the paramount duty of the state to make ample provision for the education of all children residing within its borders . . .

The *Journal of the Washington State Constitutional Convention 1889* (1962) discloses no indication that this article or section was intended to have secondary status or was to be accorded anything less than its plain meaning. In fact, Const. art. 9, § 1 is the *declaration* of the State's social, economic and educational *duty* as distinguished from a mere policy or moral *obligation.*

Careful examination of our constitution reveals that the framers declared *only once* in the entire document that a specified function was the State's *paramount duty.* That singular declaration is found in Const. art. 9, § 1. Undoubtedly, the imperative wording was intentional. Theodore L. Stiles, a member of the 1889 constitutional convention wrote:

No other state has placed the common school on so high a pedestal. One who carefully reads Article IX. might also wonder whether, after giving to the school fund all that is here required to be given, anything would be left for other purposes. But the convention was familiar with the history of school funds in the older states, and the attempt was made to avoid the possibility of repeating the tale of dissipation and utter loss.

T. Stiles, *The Constitution of the State and Its Effects Upon Public Interests,* 4 Wash. Hist. Q. 281, 284 (1913).

 It is of some significance that the plain English meaning of the word "paramount" is consistent with the foregoing. "Paramount" is not a mere synonym of "important." Rather, it means superior in rank, above all others, chief, preeminent, supreme, and in fact dominant. B. Evans, *A Dictionary of Contemporary American Usage* 350 (1957) defines it as :

> an adjective meaning above others in rank or authority, superior in power or jurisdiction . . . chief in importance, supreme, preeminent . . . When a thing is said to be paramount, it can only mean that it is more important than all other things concerned.

*Webster's Third New Int'l Dictionary* 1638 (1971) defines paramount in similar terms:

> 1: having a higher or the highest rank or authority . . . 2: superior to all others . . . Chief, Supreme, Preeminent . . . syn see Dominant

The singular use of the term "paramount duty", when taken together with its plain English meaning, is clear indication of the constitutional importance attached to the public education of the State's children.

By imposing upon the State a *paramount duty* to make ample provision for the education of all children residing within the State's borders,[9] the constitution has created a "duty" that is supreme, preeminent or dominant. Flowing

---

[9] Const. art. 9, § 1.

from this constitutionally imposed "duty" is its jural correlative, a correspondent "right"[10] permitting control of another's conduct.[11] Therefore, all children residing within the borders of the State possess a "right," arising from the constitutionally imposed "duty" of the State, to have the State make ample provision for their education. Further, since the "duty" is characterized as *paramount* the correlative "right" has equal stature.

It is also significant that the *paramount duty* is imposed upon the "State" rather than upon any one of the three coordinate branches of government. Had the framers intended that the duty be a charge upon the Legislature alone, as appellants contend, they would have so provided. However, the constitutional convention did not choose this alternative even though the framers clearly understood the difference between the "State" and the "Legislature."

We thus conclude that, in the context employed by Const. art. 9, § 1, the *paramount duty* is imposed upon the sovereign body politic or governmental entity which comprises the "State."[12] While the Legislature is an essential element thereof, it is only one segment of that intricate governmental body politic upon which has been placed the *paramount duty.*

---

[10]W. Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning,* 23 Yale L.J. 16, 30–37 (1913). *See* A. Corbin, *Jural Relations and Their Classification,* 30 Yale L.J. 226 (1921); W. Cook, *Hohfeld's Contribution to the Science of Law,* 28 Yale L.J. 721 (1919). For a recent application of the Hohfeldian concept, *see* L. Allen, *Formalizing Hohfeldian Analysis to Clarify the Multiple Senses of 'Legal Right:' A Powerful Lens for the Electronic Age,* 48 S. Cal. L. Rev. 428 (1974).

[11]W. Hohfeld, *Fundamental Legal Conceptions* 65 (1964). *See also* the foreword by Arthur L. Corbin at pages ix–xi.

[12]*Webster's Third New Int'l Dictionary* (1971) indicates that the word "state" is used in several senses. Sections 5a and 7 refer to the area of government and define "state" in the sense of a sovereign body politic. *See generally State ex rel. Maisano v. Mitchell,* 155 Conn. 256, 263, 231 A.2d 539 (1967); *Beagle v. Motor Vehicle Accident Indem. Corp.,* 44 Misc. 2d 636, 254 N.Y.S.2d 763, 765 (1964); *Delany v. Moraitis,* 136 F.2d 129, 131 (4th Cir. 1943); *McPherson v. Blacker,* 92 Mich. 377, 52 N.W. 469, 16 L.R.A. 475, 31 Am. St. Rept. 587 (1892); *Cass v. Dillon,* 2 Ohio St. 607, 616 (1853).

Consequently, all children residing within the State's borders have a "right" to be amply provided with an education. That "right" is constitutionally paramount and must be achieved through a "general and uniform system of public schools." Const. art. 9, § 2. Further, the education that is provided must be "without distinction or preference on account of race, color, caste, or sex." Const. art. 9, § 1.

Since the children residing within the State's borders possess this "right", the State may discharge its "duty" only by performance unless that performance is prevented by the holder of the "right."[13] There being no evidence that the children have prevented performance by the State, the critical question becomes whether the State has, in fact, performed its "duty."

---

[13]Although a "right" is an *absolute,* imprecise reasoning has caused courts regularly to recognize what appears to be different degrees or grades of "rights" from which flow different jural results. For example, (a) some are deemed absolute; (b) others may be impaired upon showing a compelling state interest; whereas, (c) a third group may be invaded with a showing of a mere reasonable relationship between legislation and the end sought to be accomplished. If, however, rights are truly *absolute* then clearly those that are subject to invasion or impairment are not true rights. They must be given another definition which reflects their different jural significance and justifies their dissimilar treatment.

This explanation of the difference in definition and consequent jural significance helps explain current case law but is neither intended to limit the privileges and immunities protected by the federal and state constitutions nor to denigrate what the courts have referred to as rights therein. Nevertheless, our reference to this precise method of legal thinking and terminology helps in understanding what courts have been saying about the federal and state constitutions. As Arthur L. Corbin indicated in his foreword to W. Hohfeld, *Fundamental Legal Conceptions* xiv (1964), it also helps to make it clear what the drafters of the constitution intended.

Close examination of the federal and state constitutions and the cases dealing with them, reveals that true rights exist either by reason of a positive constitutional grant or because the constitution has been so interpreted. These rights are absolute and cannot be invaded or impaired. They give rise in others (in this case the State) to correlative "duties." Certain other legal entitlements exist which, although denominated fundamental rights by the courts, are not actually rights in the sense that they are absolutes. They exist because the constitutions have, in a negative sense, provided for noninterference with specific legal entities. For example: "Congress shall make no law respecting an establishment of religion . . . or abridging the freedom of speech, or of the press . . ." U.S. Const. amend. 1.

The foregoing jural entities, while denominated fundamental rights by the courts are not treated as *absolutes* because it has been held that they may be

*Northshore School Dist. 417 v. Kinnear,* 84 Wn.2d 685, 530 P.2d 178 (1974) is overruled insofar as it is inconsistent with Section VII of this opinion.

## VIII

*Const. art. 9, § 1 imposes upon the State the paramount duty of making ample provision for the education of all resident children.*

### A. The duty.

Appellants contend Const. art. 9, § 1 should be given only that substantive meaning accorded it by the early legislatures. They argue that the action of the first legislature is entitled to great weight because several of its members participated in the constitutional convention and must have known what the framers meant when they used the phrase "make ample provision for . . . education." Const. art. 9, § 1. Thus, it is asserted, the phrase "make ample provision for . . . education" must be interpreted in light of the financing actually provided immediately after statehood.

Appellants point to the exceptionally restrictive funding provided at that time. State funding was either negligible or nonexistent. The little state money provided came from

invaded or interfered with under recognized limited circumstances. Although having a somewhat lesser status than true rights (or absolutes), the courts have recognized their extreme importance and thus tolerate societal interference only for reasons that are deemed compelling. In short, the State will not be permitted to infringe upon one's constitutional entitlement to noninterference except for extraordinary reasons. Since it does not involve a true right, however, it probably should be denominated more correctly as a fundamental *freedom,* a fundamental *liberty,* or a fundamental *privilege* (the italicized words being legally synonymous—*see* W. Hohfeld, *Fundamental Legal Conceptions* 47 (1964) and the discussion of privilege and its synonyms legal freedom and legal liberty).

In actuality, then, there is not a single class of rights. Rather there exist rights as absolutes and there are legal freedoms, liberties, or privileges (as synonyms) which, although of lesser stature than rights, are still so basically important that they may not be invaded unless there is a strong judicially recognized reason.

As stated in the body of the opinion, the mandate of Const. art. 9, §§ 1 and 2 is concerned with a true "right" (or absolute). Thus, the State's only answer is either compliance or a showing that its attempt to comply was met with interference by those claiming the right.

school lands. Funding of school construction was dependent upon voter approval. For the most part, operating revenues were dependent upon niggardly allotments made by county commissioners. This resulted in an average school year of between 4 and 5 months. Finally, school districts had virtually no taxing authority which was independent of county commissioners or the voters. This restrictive funding scheme, appellants contend, is an indication of the first legislature's view of its "paramount duty . . . to make ample provision for the education" of the resident children. Had the constitution required a stable school funding base, appellants suggest the early legislatures would have provided it.

We do not accept appellants' argument for two reasons. First, we have already said in Sections IV and V that it is a function of the judiciary, not the legislature, to interpret, construe and give substantive meaning to Const. art. 9, § 1. Second, appellants' position stems from the legal nonsequitur considered and rejected in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803), and fully considered in Section VI.

In the final analysis, however, it is not the failure of our early legislatures that troubles us. Rather, our current concern is the failure of subsequent legislatures to "make ample provision for . . . education . . ." Accordingly, we must now examine the trial court's interpretation of Const. art. 9, and the obligation it imposes upon the State.

The trial court did not and we do not attempt to deal definitively with the words "ample," "provision" or "education." Rather these terms are treated as guidelines for giving the Legislature the greatest possible latitude to participate in the full implementation of the constitutional mandate. In this sense, then, we adopt, as *guidelines,* the trial court's unchallenged conclusions of law and corresponding paragraphs of the judgment, which provide broadly:

> As used in Const. Art. 9 sec 1 the word "ample" (amply) means liberal, unrestrained, without parsimony, fully, sufficient.
>
> As used in Const. Art. 9, sec. 1, the word "provision" (provide) means preparation, measures taken before-hand; for the supply of wants; measures taken for a future exigency.

As used in Const. art. 9, § 1 "education" in its total or ultimate sense

> comprehends all that series of instruction and discipline which is intended to enlighten the understanding, correct the temper, and form the manners and habits of youth, and fit them for usefulness in the future. In its most extended signification it may be defined, in reference to man, to be the act of developing and cultivating the various physical, intellectual, aesthetic and moral faculties.

Appellants contend there can be no conclusive, static or exact definition of the phrase "make ample provision for the education" of all resident children. But, it is not seriously argued that this places the State's duty to make such provision beyond all judicial scrutiny. There are ongoing factors as well as financial and historical considerations that clearly impact the subject as well as provide a commonsense aid for determining what may or may not be "ample provision." For example, the phrase "make ample provision for . . . education" has remained unchanged since its enactment. Yet, to suggest that the State fulfills its duty to make such provision by merely providing more acceptable educational facilities than those of 1889 is utter nonsense. We cannot ignore the fact that times have changed and that which may have been "ample" in 1889 may be wholly unsuited for children confronted with contemporary demands wholly unknown to the constitutional convention.

However, to recognize changing times is not to *change* the constitution. Quite the contrary. We must *interpret* the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning. It is the judiciary's duty to ensure that the constitution does not

become "a magnificent structure . . . to look at, but totally unfit for use." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 222, 6 L. Ed. 23 (1824). A constitution is "intended to endure for the ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 416, 4 L. Ed. 579 (1819). In short, the constitution was not intended to be a static document incapable of coping with changing times. It was meant to be, and is, a living document with current effectiveness. As was so well stated by Mr. Justice Holmes in *Missouri v. Holland,* 252 U.S. 416, 433, 64 L. Ed. 641, 40 S. Ct. 382, 11 A.L.R. 984 (1920):

> [W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago.

▮ Consequently, the State's constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the marketplace of ideas. *Robinson v. Cahill,* 62 N.J. 473, 515, 303 A.2d 273 (1973); *see also Keyishian v. Board of Regents,* 385 U.S. 589, 603, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967). Education plays a critical role in a free society. It must prepare our children to participate intelligently and effectively in our open political system to ensure that system's survival. *See Wisconsin v. Yoder,* 406 U.S. 205, 221, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972). It must prepare them to exercise their First Amendment freedoms both as sources and receivers of information; and, it must prepare them to be able to inquire, to study, to evaluate and to gain

maturity and understanding. The constitutional right to have the State "make ample provision for the education of all [resident] children" would be hollow indeed if the possessor of the right could not compete adequately in our open political system, in the labor market, or in the marketplace of ideas.

In short, we agree with the trial court's conclusions of law and judgment as they express these same broad educational concepts in terms of constitutional rights. The trial court did not, nor do we, deal with the above mentioned educational concepts as fully definitive of the State's paramount duty. Rather, we hold that they constitute broad guidelines and that the effective teaching and opportunities for learning these essential skills make up the *minimum* of the education that is constitutionally required.

We hold further that the mandate of Const. art. 9, § 1 is addressed to the State and requires, as a first priority, fully sufficient funds for the "general and uniform system of public schools" which the *Legislature* is obligated to establish pursuant to Const. art. 9, § 2. Through this system our children will receive their constitutionally guaranteed education.

 B. Legislative implementation of the State's mandatory duty.

Although the mandatory duties of Const. art. 9, § 1 are imposed upon the *State,* the organization, administration, and operational details of the "general and uniform system" required by Const. art. 9, § 2 are the province of the *Legislature.* In the latter area the judiciary is primarily concerned with whether the Legislature acts pursuant to the mandate and, having acted, whether it has done so constitutionally. Within these parameters, then, the system devised is within the domain of the Legislature.

While the judiciary has the duty to construe and interpret the word "education" by providing broad constitutional guidelines, the Legislature is obligated to give specific substantive content to the word and to the program it

deems necessary to provide that "education" within the broad guidelines. However, the broad guidelines which we have provided do not contemplate that the State must furnish "total education" in the sense of *all* knowledge or the offering of *all* programs, subjects, or services which are attractive but only tangentially related to the central thrust of our guidelines. Specifically, then, we shall refer to the Legislature's obligation as one to provide "basic education" through a basic program of education as distinguished from total "education" or all other "educational" programs, subjects, or services which might be offered.

With the foregoing considerations in mind, we note that the Legislature has heretofore enacted laws to "provide for a general and uniform system of public schools." However, it has not as yet fully implemented Const. art. 9, §§ 1 and 2 by defining or giving substantive content to "basic education" or a basic program of education. Thus, the Legislature must hereafter act to comply with its constitutional duty by defining and giving substantive meaning to them.[14]

Respondents also suggest the need for additional judicial guidelines for matters less fundamental than those discussed heretofore. For example, they suggested we adopt guidelines concerning (1) deployment of instructional and classified staff; (2) staffing ratios and salaries; (3) individualization of instruction for the handicapped, gifted, below average, and for the particular unique needs of students; (4) recognition of unique demographical and geographical

---

[14]Subsequent to trial but almost simultaneously with this appeal, the Legislature enacted Ch. 359, Laws of 1977, 1st Ex. Sess., entitled "The Washington Basic Education Act of 1977." This act indicates a commendable effort to alleviate the constitutional void referred to above; however, we cannot pass on its constitutionality at this time. It was not considered below and is not properly before us for constitutional review. To pass upon the constitutionality of the legislation in this setting would amount to an advisory opinion which we will not render. *See Swift v. Island County,* 87 Wn.2d 348, 350, 552 P.2d 175 (1976); *Cooper v. Department of Institutions,* 63 Wn.2d 722, 724, 388 P.2d 925 (1964); *Hutchinson v. Port of Benton,* 62 Wn.2d 451, 456, 383 P.2d 500 (1963). However, we do note the cooperative action taken by the Legislature.

demands; (5) local control; and (6) support services. However, in light of the judicial guidelines already set forth and considering the need for the Legislature to rethink and retool much of the present educational system, so that it may mesh as a working whole, we decline respondents' invitation. We are confident the Legislature will consider each of these concerns as well as all other appropriate matters when framing its definition of basic education and when giving substantive content to a basic program of education. There are important policy reasons, historical and otherwise, that pertain to these concerns. But, we cannot say at this time that any one of them, standing alone, rises to a constitutional imperative requiring immediate judicial intervention. While the Legislature must *act* pursuant to the constitutional mandate to discharge its duty, the general authority to select the *means* of discharging that duty should be left to the Legislature. *See Newman v. Schlarb,* 184 Wash. 147, 153, 50 P.2d 36 (1935).

Finally, the constitution requires more than a mere definition of "basic education" or a basic program of education. As we will discuss fully in Sections IX and X below, the State also has an affirmative paramount duty to make ample provision for funding the "basic education" or basic program of education defined. This funding must be accomplished by means of dependable and regular tax sources and cannot be dependent on special excess levies. See Section XI, below.

Insofar as *Northshore School Dist. 417 v. Kinnear,* 84 Wn.2d 685, 530 P.2d 178 (1974) is inconsistent with Section VIII of this opinion, it is overruled.

## IX

*The State's affirmative paramount duty to make ample provision for the education of its resident children is mandatory and is not limited to revenue derived from sources specified in Const. art. 9, §§ 3 and 5 and Const. art. 16.*

Appellants argue that "ample provision for the education of all [resident] children", mandated by Const. art. 9, § 1, may be achieved only by resort to revenue derived from Const. art. 9, §§ 3 and 5 and possibly Const. art. 16. Appellants stress that Const. art. 9, § 3 concerns establishment and maintenance of a "permanent and irreducible" common school fund; that Const. art. 9, § 5 deals with protection of the permanent common school fund; and, that Const. art. 16 pertains to school lands. They contend that by adopting the foregoing three sections the framers of the constitution believed they had fulfilled their "paramount duty."

The suggestion is ingenious, but it is not supported by history, the *Journal of the Washington State Constitutional Convention 1889,* or logic. Had the members of the constitutional convention been satisfied that the funds available from Const. art. 9, § 3 would be fully sufficient to comply with the mandate of Const. art. 9, § 1, why did they also provide in section 3:

The legislature may make *further provisions* for enlarging said [common school] fund.

(Italics ours.) By expressly providing for *expansion* of the common school fund beyond that initially authorized by Const. art. 9, § 3, the framers must have been mindful that *future* demands for financing common schools might be greater than those encountered in 1889. Further, if "ample provision for the education of all [resident] children" was to be made solely from common school funds, why does Const. art. 9, § 5 also provide for the protection of "*any other* state educational fund"? Again, the constitutional draftsmen must have contemplated that funds, *other than* common school funds, were to be available for *and used* to educate our resident children.

Moreover, the State's paramount duty to "make ample provision for the education of all [resident] children" must

be discharged by means of a "general and uniform system of *public schools.*" (Italics ours.) Const. art. 9, § 2. The general and uniform system contemplated by the constitution is neither limited to common schools nor is it synonymous therewith. Const. art. 9, § 2 provides for something considerably more extensive: a *public school system* that "shall *include* common schools, *and* such *high schools . . .* as may hereafter be established." (Italics ours.) It is of interest that no provision is made for the Legislature to disestablish the high school system once it has been established.

The affirmative paramount duty of the State to "make ample provision for the education of all [resident] children" is *not* limited to revenues derived from funds specified in Const. art. 9, §§ 3, 5 or possibly Const. art. 16. At best these sources provide an *irreducible minimum* devoted primarily to *common schools.* But, that *minimum* cannot be equated with the "ample provision" required for an education that is nowhere limited to the common schools. Rather, Const art. 9, § 2 refers to a "public school system" which includes the common schools as merely one segment of that general and uniform system which also includes high schools. Const. art. 9, §§ 1 and 2 require the State to amply provide for the education guaranteed through the medium of "a general and uniform *system of public schools.*" (Italics ours.)

Thus we hold, compliance with Const. art. 9, §§ 1 and 2 can be achieved only if sufficient funds are derived, through dependable and regular tax sources, to permit school districts to provide "basic education" through a basic program of education in a "general and uniform *system of public schools.*" (Italics ours.)

Insofar as *Northshore School Dist. 417 v. Kinnear, supra,* is inconsistent with Section IX of this opinion, it is overruled.

## X

*The State has a mandatory duty to make ample provision for the basic education of resident children through a general and uniform system.*

### A. The immediate duty rests upon the Legislature.

 As we indicated in Section IX, the State must make ample provision for the "basic education" of our resident children through a general and uniform system supported by dependable and regular tax sources. While Const. art. 9, § 1 imposes upon the State the basic duty of making "ample provision for the education of all [resident] children," it is not self–executing insofar as legislation is required to give effect to the mandate. However, the fact that the Legislature possesses an ultimate obligation to act is not to say that it may act or not act as it chooses. The duty to act as well as the duty to do so within the parameters of Const. art. 9, §§ 1 and 2 is constitutionally required.

### B. A constitutionally imposed "duty" giving rise to correlative jural "rights" does not give rise to similar "rights" in areas not similarly declared constitutionally paramount.

 Appellants argue that to impose upon the State a mandatory duty to make ample provision for the education of its resident children through regular and dependable tax sources will open a pandora's box. It is suggested that if the educational system is accorded such preeminence, other state functions will demand similar treatment because they are either mentioned in the constitution or have an important statewide impact.

Whether others will seek larger portions of the tax dollar is unpredictable. However, such attempts cannot be made on the same constitutional basis. Only in Const. art. 9, § 1 is it declared a paramount duty of the State to make ample provision for a service mandated by the constitution.

## XI

*Statutory authorization of special excess levy elections does not satisfy the State's constitutionally mandated duty under Const. art. 9, §§ 1 and 2.*

Appellants contend the State's affirmative duty to "make ample provision for the education of all [resident] children" may be fulfilled by authorizing school districts to submit special excess levy requests. We do not agree.

Historically, the operation and maintenance of public schools have been funded *in part* by special excess levies. While legislative appropriations for such schools have continually increased, they have not kept pace with increased costs incurred by school districts operating under existing statutes and regulations. For example, in 1960 the total amount of special excess levies raised for the maintenance and operation of schools was $8.4 million or approximately 6.8 percent of the total school maintenance and operation costs. By school year 1974–75, the proportion of special excess levy revenue needed to finance maintenance and operating costs within the State had increased to approximately 25.6 percent of the total maintenance and operation budget. Reliance upon special excess levy funding increased in 1975 to $299 million and in 1976 is expected to increase to $341 million. The experience of the District is no different. In 1974–75, a special excess levy of $43.6 million represented 37.7 percent of the District's total revenues.

As long as voters approved special excess levies sufficient to operate and maintain local school systems, there were no challenges to special excess levies other than in *Northshore School Dist. 417 v. Kinnear, supra.* Yet, even when levies did pass problems arose. School boards frequently submitted inadequate levy requests based upon "practical politics," rather than need, to ensure passage.

During the 1975–76 school year, 40 percent of the students in this state, including those in the District, resided in levy loss districts. Such levy defeats placed public school education in immediate danger. In fact, the District was

forced to reduce substantially the teaching staff at both the elementary and secondary levels. This change in the student–teacher ratio reduced the subject offerings per student. Individualized instruction and counseling were also decreased. Loss in program coordination, as well as a delay in or a reduction of services, ensued. The budget for books, programs, and supplies was reduced. Security personnel was substantially decreased. Ballard High School's accreditation was placed on temporary status. Finally, the District was unable to adequately care for or maintain its deteriorating physical plant.[15]

As we said in Section IX, the State complies with its mandatory duty to make ample provision for basic education only if sufficient funds, derived through *dependable* and *regular* tax sources, are provided. The special excess levy is neither dependable nor regular. It is wholly dependent upon the whim of the electorate and is then available only on a temporary basis. A levy defeat ensures that needed funds will not be available. This unstable statutory system destroys a district's ability to plan for a known or definite funding base for either the current year or for future years.

Further, the levy system's instability is demonstrated by the special excess levy's dependence upon the assessed valuation of taxable real property within a district. Some districts have substantially higher real property valuations

---

[15]Although the District suffered a double levy failure in 1975, it was not completely without special excess levy funds for the school year 1975–76. Because of the manner in which taxes are collected, the last half of the special excess levy authorized the previous year was collected in October of 1975. This amount, $25,137,499 or 23.4 percent of the total revenues of the District, represented a 42 percent decrease in the special excess levy amount collectible between 1974–75 and 1975–76 because of the levy failure. This equaled approximately a $10 million budget reduction.

Because of the levy loss crisis throughout the State, the Legislature appropriated $65 million to assist the impacted schools. Laws of 1975–76, 2d Ex. Sess., ch. 7. The funds disbursed to the District from the levy relief appropriation amounted to $8,315,820, made up of $5,165,820 (based upon $82.50 per full time equivalent student in the District) and $3,150,000 in supplemental URRD grant funds.

than others thus making it easier for them to raise funds. Such variations provide neither a dependable nor regular source of revenue for meeting the State's obligation.

Appellants have reminded us of the financial burden that may be faced by the Legislature if we hold unconstitutional the statutory system of special excess levies. We do not doubt that ever increasing demands upon the Legislature by state agencies, departments and institutions have reached near crisis proportions. However, none has the mandatory constitutional recognition found in Const. art. 9, §§ 1 and 2. Though the crisis is recognized, it does not change the constitutional duty of the court or the Legislature. *See State ex rel. Lemon v. Langlie,* 45 Wn.2d 82, 110, 273 P.2d 464 (1954).

We hold that any statutory scheme which authorizes the use of special excess levies to discharge the State's paramount duty of making ample provision for "basic education" or a basic program of education is not the dependable and regular tax source required to comply with Const. art. 9, §§ 1 and 2. Thus, we agree with the trial court that the statutory funding scheme extant during school year 1975–76 is unconstitutional.[16] However, we do not hold that *all* resort to the use of special excess levy funds is forbidden. The Legislature may authorize utilization of special excess levies to fund programs, activities and support services of a district which the State is *not required* to fund under its basic mandate. Thus, if local taxpayers desire to fund an "enrichment program" which *goes beyond* that required by the constitution, they may do so by means of a special excess levy.

---

[16]Subsequent to trial but almost simultaneously with this appeal the Legislature enacted Laws of 1977, 1st Ex. Sess., ch. 325, pertaining to special excess levies, better known as the "Levy Lid Act." Thereafter, the Legislature enacted Laws of 1977, 1st Ex. Sess., ch. 339, §§ 94, 96 and 97 as the "first step" in the Legislature's commitment to phase in full funding of basic education by the 1980–81 school year. As observed in footnote 14, these acts are not before us at this time for constitutional review nor were they considered by the trial court. *See Swift v. Island County,* 87 Wn.2d 348, 350, 552 P.2d 175 (1976); *Cooper v. Department of Institutions,* 63 Wn.2d 722, 724, 388 P.2d 925 (1964); *Hutchinson v. Port of*

Insofar as *Northshore School Dist. 417 v. Kinnear, supra,* is inconsistent with Section XI of this opinion it is overruled.

## XII

*Special excess levies are unconstitutional insofar as they are used to fund other than "enrichment programs." The balance of the statutory and regulatory system of common school financing fails to make ample provision for the education of children residing in respondent district.*

A. Explanation of the system and application to respondent district.

In Section XI we declared the special excess levy system of funding unconstitutional insofar as it is used to fund other than "enrichment programs." We now consider whether the trial court correctly determined that the State failed to make ample provision for the education of the District's children during school year 1975–76. We agree the State failed to make such provision.

Appellants initially challenge the evidence as insufficient to support the trial court's findings of fact and conclusions of law pertaining to the reasonableness of the District's salary scale, staffing ratios, associated nonsalaried costs and consequently the failure of the State to adequately fund those reasonable costs. Appellants assert that even if the judiciary has the power to declare a prescribed level of state funding constitutionally required, it can only declare a *specific* funding level inadequate if supporting evidence meets the "highest burden of proof," citing *In re Juvenile Director,* 87 Wn.2d 232, 552 P.2d 163 (1976). Appellants contend respondents have failed to meet that strong burden and thus the trial court improperly injected itself into the subject of the District's funding. We do not agree.

*Benton,* 62 Wn.2d 451, 456, 383 P.2d 500 (1963). Nevertheless, we do note the cooperative action taken by the Legislature.

■■■ *In re Juvenile Director, supra,* is not in point. There, we were concerned with the judiciary's need to set a high standard of proof for *itself* when exercising its inherent power *on its own behalf.* In that light, we employed a *self–imposed* restriction, for dealing with *court funding,* by requiring the "highest burden of proof" and the "clear, cogent, and convincing" test. Here, unlike *Juvenile Director,* the financial needs of the judiciary vis–a–vis the Legislature are not at issue. Rather, we are concerned with legislative compliance with a specific constitutional mandate. Unlike *Juvenile Director,* the court has no financial interest. Thus, contrary to appellants' contention, the normal *civil burden of proof, i.e.,* "preponderance of the evidence", applies.

Further, much of appellants' argument is an assertion that the trial court should have believed its witnesses rather than those of respondents and should have found different facts. In this regard appellants' position is not well taken because we have already noted that there is substantial evidence to support the trial court's findings of fact.

We now turn to the level of State funding provided the District in the year 1975–76, independent of special excess levy funds. The trial court held, and we agree, that the funds provided the District through the equalization formula were insufficient to fund a "basic program of education."

The District receives the bulk of its general fund resources from the State through an apportionment formula which operates on the premise of an equal guaranty in dollars for each weighted student enrolled, based upon one full year of 180 days. RCW 28A.41.130. "Weightings" are used to increase the State's allocation to a district for costs associated with particular programs, the type of district, training or experience of the staff, or circumstances involving students enrolled. The State guaranty is determined by dividing total state and local revenue available by the total number of "weighted" pupils.

Only the applicable weighting factors apply in each district and then only for the appropriate pupils and staff. A full time equivalent student (FTE) is calculated on the basis of 180 days, *i.e.*, one school year. The weightings are as follows:

| | |
|---|---|
| Basic enrollment—full time equivalents (FTE) | 1.0 |
| Approved vocational classes—per annual class hour | .2 |
| Staff experience | .0 to 1.0 |
| Children from tax exempt homes or institutions | .25 |
| Remote and necessary elementary schools or districts | .004 to 2.0 |
| Small high schools—less than 250 enrolled | .002 to 2.0 |
| Interdistrict cooperation—approved program | .25 |

The staff weighting factor is the most significant of all the weighting factors. It is developed each year for each district and it reflects the placement of appropriate certificated staff for that year. However, the factor developed for each district is delayed 1 year so that the prior year's factor is used in the formula calculations. The factor is based on the composite average levels of the staff's certification, education, and experience. The purpose of the staff weighting factor is twofold: (1) to recognize salary costs where they occur; and (2) to enhance recruitment of appropriately trained and experienced staff by local school districts. This factor thus generates additional funds to districts based upon actual salary requirements. As a consequence of this factor, the District received more dollars per FTE than the state average.

The State weighted pupil guaranty does not include the excess cost allocation for special education programs, or funding for traffic safety education, pupil transportation, food services, and other categorical programs. Within these

program appropriations, a built–in obligation exists for the expenditures specifically associated with the programs.

Since there is no longer a regular local property tax for schools, this revenue is not included in the 1975–77 formula. With the exception of the State and County Forest Funds (included at 75 percent) and In Lieu of Leasehold Excise Tax (at 50 percent), all other applicable local revenues are included at 100 percent of actual receipt for the 1975–76 school year. For the 1976–77 school year all applicable local revenues are included at 100 percent. The 100 percent deductible revenues include:

In–Lieu–of Tax Receipts
1 percent Real Estate Excise Tax
Federal Forest Funds
Public Utility District Funds
State and County Forest Funds—Local
Timber Excise Tax—Reserve Fund.

In 1973 the Legislature eliminated from the formula both "assumed money"[17] and, on a phased in basis, "leeway money."[18] The levying authority of the local school districts for regular property taxes was also eliminated. The regular property tax for schools was placed at the state level, with the revenue distributed under the apportionment formula

---

[17]Unchallenged finding of fact No. 648 provides:

"'Assumed money' represented that amount of money which a school district was 'assumed' to have received from its regular property tax levy, regardless of whether it did in fact receive that amount. The amount 'assumed' was computed on the basis of 14 mills levied on an assessed valuation adjusted to 25 percent of true and fair value as determined by the State Department of Revenue. Thus, if a local assessor was valuing property at less than the statutory levy, the local school district would receive less dollars from its actual regular property tax levy than was 'assumed,' i.e., deducted for purposes of the state apportionment formula."

[18]Unchallenged finding of fact No. 650 provides:

"'Leeway money' is that amount of local school district revenues, including local regular property tax revenues, which was not computed as a deduction in the apportionment formula for purposes of determining the amount of state funds to be distributed under the per pupil guarantee. Thus, under the formula only 85 percent of certain local revenue sources, including the local regular property tax, was deducted. The remaining 15 percent constituted the 'leeway money.'"

rather than, as with the "two mill shift,"[19] dollar–for–dollar back to the district from which it was derived. The effect of "assumed money" upon school districts was alleviated in whole or in part, by the "two mill shift."

In order to alleviate the possible adverse impact of these changes on certain school districts, the Legislature enacted a "grandfather" clause providing that the per pupil guaranty (under the new formula) would not be less than 95 percent of the average amount received per enrolled student, excluding excess levies, by any district during the preceding 3 school years. RCW 28A.41.130.

During school year 1974–75, the District actually received $28,268,185 in state funds for its regular K–12 program. In school year 1975–76, it was estimated that the District would receive $43,592,494 in state funds for its regular K–12 program. Generally, the difference between the two figures may be attributed to the fact that in previous years the regular local property tax which was collected in the District accrued to the District itself. Legislative changes (equalization of general real property taxes) resulted in reassignment of those regular property taxes to the State for collection and redistribution to the districts throughout the state on an equalized basis. The 1975–76 figure reflects the complete change following a partial phasing in of the program.

Using the State average real property valuation per FTE student as a base for comparison, the District has about two–thirds more real property valuation per FTE student than the statewide average. However, because of the equalization of *regular* levy taxes on real property, the regular real property taxes levied on property within the District are only partially retained by the District for the benefit of

---

[19]Unchallenged finding of fact No. 649 provides in part:

"Under the 'two mill shift,' the stated reduced the levying authority of the school districts for regular levies by two mills, levied that two mills itself on the state equalized assessed valuation, which was significantly higher than the locally determined valuation, and distributed the proceeds of the tax back to the local district from which it was derived."

its students. Despite the "grandfather clause," the conversion to the state equalization formula represents a loss of approximately $2 to $4 million to the District.

Beginning with the 1973–74 school year, the present system for computing the staff weighting factor was adopted. Consequently, state appropriations for salary improvements which had previously been distributed outside the formula could now be distributed within the formula, by simply increasing the amount of funds to be distributed under the formula.

Under the apportionment formula, the State distributes money to school districts on the basis of FTE weighted students. However, the actual dollar amount per FTE enrolled pupil in the District does not include categorical funding for such programs as handicapped, special education, pupil transportation, food service, traffic safety education, the gifted program, drug abuse or URRD (Urban, rural and racially disadvantaged).

The number of "weighted" students in the District during school year 1975–76 was 102,553.08. The State guaranty per "weighted" pupil for school year 1975–76 was $480. Thus, the total state funds available to the District for 1975–76 after deducting revenues from the real estate transaction tax, the in–lieu–of taxes, 50 percent of the leasehold in–lieu–of excess tax and federal forest funds, was $45,105,478.

For school year 1975–76, the anticipated revenue to the District in guaranteed support through the State apportionment formula would not change if the FTE pupil to FTE certificated staff ratio were reduced from 30:1 to 20:1. A reduction in this ratio would, however, increase significantly the District's expenditures.

With the foregoing factors in mind, we next consider whether the trial court correctly determined that the funds provided the District by the State were insufficient to fund a basic program of education during school year 1975–76.

Initially, it must be recognized that the trial court was confronted with the dilemma. At the time of trial the Legislature had defined neither "basic education" nor the requisites of a basic program of education. In the absence of such a definition, the trial court considered three suggested definitions of "basic education" and "costed out" each to determine whether the State funding thereof was sufficient. The three definitions utilized were: (1) the May 14, 1976, definition provided by the State Board of Education/Superintendent of Public Instruction; (2) application of State Board of Education accreditation standards, as if they applied to kindergarten through high school; and (3) the "collective wisdom" approach.

The trial court concluded that irrespective of the educational definition used, the State's provision of funds to the District was insufficient. Having specifically considered each approach employed by the trial court, we agree that State funding was insufficient to provide for any of the suggested definitions of "basic education" or a basic program of education. It is also clear that respondents sustained the burden of proving that the State failed to make ample provision for education as required by Const. art. 9, § 1.

At this point it is important to note an important factor in terms of operating the District. In terms of "quantitative input," staffing ratios and salaries are the most significant factors in determining the cost of education within a district. In this regard, we again note that there is substantial evidence in the record to support the trial court's finding of fact that in 1975–76 the average salaries paid in the District to both certificated and classified employees were *reasonable*.

We now refer more specifically to the three approaches employed by the trial court, in the absence of a legislative definition of "basic education" or a basic program of education. The first definition pertains primarily to the present requirements of state statutes and the regulations of the Board and the SPI. Although this definition was not

intended to be a funding mechanism, its use is appropriate when considering the most significant impact on costs, *i.e.*, staff ratios, salary expenses, teacher qualifications, instructional requirements, hours, and specific substantive requirements. But, we note with interest that even the minimum ratio contained in the SPI definition when "costed out" against the definition's minimum programs, produces an apparent deficit of $933,045. Moreover this deficit would be increased by $8,315,830 had the Legislature not provided that amount to the District through the Special Levy Relief Act following the District's double levy failure. We also note that the definition used by the Board *excludes* kindergarten notwithstanding its *inclusion* within the definition of "common schools" in RCW 28A.01.060. Kindergarten is an integral part of the District's program. Had kindergarten been included in the "costing out," even more State funding would have been required. Finally, if the handicapped programs are included, as the definition suggests, an additional deficit of $275,640 would have existed.

Consequently, it is clear that the State funding would be insufficient to permit the District to operate if "costed out" pursuant to the Board/SPI definition of "state program of education."

Turning next to the costs associated with the second suggested definition (accreditation—K–12), we find State financing equally deficient. We are aware that accreditation standards are not actually funding mechanisms. Further, they ordinarily apply only to grades 7–12. However, accreditation standards are intended to assure a *quality program* to help graduates prepare for higher education and/or occupational opportunities. The standards provide evidence of accountability that a school district is making judicious use of the resources at its command. Thus, in the absence of a legislative definition of "basic education" and considering the nature of these standards, the accreditation standards may be appropriately treated as if they applied to the K–12 program. By so doing, it is clear that State

funding would again be insufficient but for the State's reliance upon funds unconstitutionally generated by special excess levies.

Under the accreditation approach, the District's education requirements for 1975–76 (including kindergarten) would be $75,905,575 whereas the State guaranty ($47,266,694.40) plus other funds available including the excess levy relief funds provided by the Legislature would amount only to $57,640,788. The evidence clearly demonstrates that the funding level for such education under *existing law* is insufficient.

Finally, a somewhat less exacting approach to defining "basic education" may be found by using what has been called the "collective wisdom" approach. In the absence of scientific proof to conclusively demonstrate a relationship between educational "quantitative inputs" and "qualitative outputs," this approach seeks to provide standards for needed educational resources by focusing upon the theoretical "normal range ability" student as determined by the collective experience of local educators, school boards, and parents. The approach concentrates upon the statewide aggregate average per pupil deployment of certificated and classified staff and nonsalary related costs for the maintenance and operation of a school program for the normal range student. This approach is not entirely wide of the mark insofar as the Legislature delegates the responsibility to local districts to ultimately determine program, services, staffing ratios and salaries necessary to provide an educational program. Having delegated this responsibility, it would seem only reasonable that the districts be provided with sufficient funding to operate the system.

Under the "collective wisdom" approach, deployment of staff is established at a level of 20 to 1 (pupil per certified employee), or 25 to 1 (pupil to classroom teacher). Clearly, such a ratio is not being funded.

As the foregoing figures demonstrate, and despite the definition used for "education," *under existing law* the State has not made "ample provision" therefor as required by Const. art. 9, § 1.

B. Alleged surplus.

Appellants contend that an $8 million surplus existed in the District for the 1975–76 school year. It is urged that since this "surplus" could have been used for any purpose, the District actually had sufficient funds. We disagree.

The alleged "surplus" came from two sources: (1) underexpenditure on budgeted items ($6.5 million) and (2) underestimation of total revenues ($1.5 million). Given the instability of the special excess levy system, it is entirely understandable that a school district may be unable to accurately project exact revenues and exact expenditures for the future year. Our review of the findings of fact also reveals that the District's underexpenditure arose from several sources: an unused emergency reserve, warrant interest, lower cost of food services, lower cost of facility operation, and lower transportation costs. It is true these funds could have been used elsewhere. However, it must be remembered that both *then and for several years prior thereto,* the District was operating on a "deferred mainte-nance" basis resulting in reduced cleaning standards, use of emergency maintenance, and a delay in repair of instruc-tional equipment, building maintenance, interior and exte-rior painting, floor replacement and many other items. In short, the so–called "surplus" cannot be considered "money in the bank" when considered in light of what had remained undone both in the area of maintenance and the foregoing of salary raises in the school year 1975–76. Fur-ther, had the District granted salary increases based upon the consumer price index increase, this factor alone would have cost an additional $11,157,749. Thus, we can only conclude that the so–called $8 million "surplus" would not have placed the District in a full funding position insofar as the State is concerned.

Accordingly, we hold that in the absence of unconstitu-tional special excess levy funds, the State system of school

funding during school year 1975–76 did not comply with Const. art. 9, § 1 in making "ample provision" for the education of the children residing within the District.

Insofar as *Northshore School Dist. 417 v. Kinnear*, 84 Wn.2d 685, 530 P.2d 178 (1974) is inconsistent with Section XII of this opinion, it is overruled.

## XIII

*The Legislature has not expressly determined, in any current law, the level of funding (or deployment of resources) which is fully sufficient to provide the "basic education" mandated by Const. art. 9, §§ 1 and 2.*

Upon review of the law and the briefs, we conclude that the Legislature has not expressly determined a level of funding (or deployment of resources) which would be fully sufficient to provide the "basic education" or a basic program of education mandated by Const. art. 9, §§ 1 and 2.

While we are aware legislation was enacted subsequent to the trial of this case (see footnotes 14 and 16), that legislation is not before us and any comment thereon would be both dicta and advisory in nature. In either event we should not consider the matter at this time.

## XIV

*Prospective application of this opinion.*

We have great faith in the Legislature and its ability to define "basic education" and a basic program of education and also to fund such education without reliance upon special excess levies. Nevertheless, we do not minimize the task.

The State has developed its current educational and funding system over a period of many years. Without question the changes required herein will have an immediate and major impact upon that system. Thus, the Legislature must be given an adequate opportunity to comply with our decision.

Consequently, we hold that the relief granted herein shall be *prospective* and shall not be construed or considered as invalidating, in any way, acts done or obligations incurred under existing statutes and regulations, if otherwise constitutional. Further, until July 1, 1981, all acts taken under existing statutes shall be deemed valid, if otherwise constitutional. Beyond this, however, it is the duty of the Legislature to enact legislation compatible with this opinion by July 1, 1981. To this extent, the judgment of the trial court requiring compliance by July 1, 1979, is modified.

The prospective treatment of this decision is not inconsistent with our determination that the system of funding is in fact unconstitutional. In *Carkonen v. Williams,* 76 Wn.2d 617, 458 P.2d 280 (1969) we adopted a similar approach to allow the State and counties necessary time to rework assessment procedures to comply with a decision of this court having a similar severe fiscal impact. *See also Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (1973); *Brown v. Board of Educ.,* 349 U.S. 294, 99 L. Ed. 1083, 75 S. Ct. 753 (1955).

## XV
*Retention of jurisdiction modified.*

Next, it is necessary to determine whether there was a need for the trial court to retain jurisdiction over the action and the parties. In this regard, we note the trial court's refusal to grant respondents' request to specify the relief it would give if the Legislature failed to comply with the judgment. This refusal was correctly based on the assumption that the Legislature, as a constitutional body, would comply with the constitutional mandate. Legislators, as well as judges, are sworn to support the constitution of the State of Washington and we see no reason to assume legislators will fail to act in good faith to comply with their oath.

The trial court's decision to retain jurisdiction is inconsistent with the assumption that the Legislature will comply with the judgment and its constitutional duties. Consequently, we modify that portion of the judgment

retaining jurisdiction over the parties and action. We have every confidence the Legislature will comply fully with the duty mandated by Const. art. 9, §§ 1 and 2 within the time specified in the judgment as here modified.

Having declined to exercise our discretion to retain jurisdiction over the parties and the action, we also modify that portion of the trial court's judgment denying "at this time" respondents' prayer (1) for a writ of prohibition against allocation of funds to local school districts; (2) for a writ prohibiting the State Treasurer from disbursing State funds; and (3) for a judicially declared constitutional standard against which the substantive content of "basic education" shall be measured.

## XVI
*The trial court's refusal to award respondents reasonable attorneys' fees.*

Respondents have cross-appealed assigning error to the trial court's refusal to allow them reasonable attorneys' fees. They contend such fees should have been awarded either under RCW 7.16.260 or RCW 7.24.100, pursuant to the "common fund/common benefit" doctrine as an exception to the American Rule, or under the court's inherent equitable powers. We do not agree.

By way of support, respondents point to unchallenged findings of fact that they were billed $199,035.50 for attorneys' fees. Based upon the skill, time involved, and nature of the action, the fees charged were found to be reasonable even though they represent only those sums accumulated through December 25, 1976. Other unchallenged findings of fact reveal that this litigation secured a substantial benefit common to all public school children. Finally, the trial court found that the most equitable way to assure that the benefited class would bear its share to the total burden would be to assess attorneys' fees against appellants. Respondents' suggestion for awarding attorneys' fees was to assess them against the State and require payment by way of a judgment from taxing sources.

Respondents' action was instituted seeking writs of prohibition, a writ of mandate, a declaratory judgment and damages. Respondents' prayer for the writs of prohibition was denied and they have not cross–appealed either that denial or the denial of their damage claim. Consequently, we need not decide whether RCW 7.16.260 authorizes a trial court to award reasonable attorneys' fees to a *prevailing party.* Further, respondents did not claim to have proceeded as a "private attorney general." Thus, we express no opinion as to the applicability of that theory in this or other cases.[20]

We have consistently refused to award attorneys' fees as part of the cost of litigation in the absence of a contract, statute, or recognized ground in equity. *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 176, 570 P.2d 428 (1977); *Hsu Ying Li v. Tang,* 87 Wn.2d 796, 797–98, 557 P.2d 342 (1976); *Swift v. Island County,* 87 Wn.2d 348, 362, 552 P.2d 175 (1976); *see Beadle v. Barta,* 13 Wn.2d 67, 74, 123 P.2d 761 (1942); *State ex rel. Macri v. Bremerton,* 8 Wn.2d 93, 102, 111 P.2d 612 (1941); *Miesen v. Motter,* 115 Wash. 49, 55, 196 P. 659 (1921). In this case there is no contract for attorneys' fees. Thus, we must determine whether there is either a statutory or equitable basis for such an award.

Respondents point to the fact that they have prevailed in an action for declaratory judgment and thus are entitled to reasonable attorneys' fees under RCW 7.24.100, which provides:

In any proceeding under this chapter, the court may make such award of *costs* as may seem equitable and just.

---

[20]Of similar import *see PUD 1 v. Kottsick,* 86 Wn.2d 388, 392, 545 P.2d 1 (1976) and *Weiss v. Bruno,* 83 Wn.2d 911, 913, 523 P.2d 915 (1975). This court has yet to adopt the "private attorney general" exception to the "no–attorney fees" rule. As we said in *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 177, 570 P.2d 428 (1977): "As for the 'private attorney general' doctrine, we have not extended that doctrine beyond its application in a 'common fund' situation."

(Italics ours.) However, RCW 7.24.100 is not a statutory authorization for attorneys' fees. Referring to this statute and the meaning of "costs" as used therein we have said: .

'costs' do not include attorneys' fees (other than statutory) or accountants' fees. . . .

"'The term "costs" is synonymous with the term "expense." Costs are allowances to a party for the expense incurred in prosecuting or defending a suit, and the word "costs," . . . does not include counsel fees; *in other words, counsel fees are not costs or recoverable expenses incurred in prosecuting or defending a suit, either in suits in equity or actions at law.*

(Italics ours.) *Rocky Mt. Fire & Cas. Co. v. Rose,* 62 Wn.2d 896, 899–900, 385 P.2d 45, 1 A.L.R.3d 876 (1963), quoting from *Chapin v. Collard,* 29 Wn.2d 788, 795, 189 P.2d 642 (1948). In *Rocky Mt. Fire & Cas. Co., supra,* we concluded that the court was without power to award attorneys' fees, other than statutory fees, under the provisions of the declaratory judgments act. *See Fiorito v. Goerig,* 27 Wn.2d 615, 619, 179 P.2d 316 (1947); *Schoenwald v. Diamond K Packing Co.,* 192 Wash. 409, 421, 73 P.2d 748 (1937). *See also Fritz v. Gorton,* 83 Wn.2d 275, 315, 517 P.2d 911 (1974). Accordingly, we affirm the trial court's determination that it was without power under the declaratory judgments act to award attorneys' fees *other than* statutory attorneys' fees. Further, respondents have not directed our attention to *any other statutory basis* upon which reasonable attorneys' fees can be awarded. Consequently, we also affirm the trial court's holding that it lacked statutory authority to make the requested award.

Next, respondents argue that reasonable attorneys' fees may be awarded because this litigation has *benefited* a recognized class and that attorneys' fees may be imposed upon the *fund* created by the litigation, citing *Hein v. Forney,* 164 Wash. 309, 319, 2 P.2d 741, 78 A.L.R.3d 631 (1931) and *Drain v. Wilson,* 117 Wash. 34, 200 P. 581 (1921). However, neither *Hein* nor *Drain* is in point. In each, the litigation produced or preserved an *actual* fund under the court's control that would not have existed but

for the lawsuit. In each case we referred to the fund as an "estate" or a "trust fund," and logically so. The fund acquired or preserved did not devolve solely to the benefit of the immediate litigant, but was to be divided among all members of a closely defined class. In *Hein,* a creditor's challenge to the receiver's report preserved the "estate" for the remaining lawful creditors. In *Drain,* the action resulted in the creation or augmentation of a fund for the benefit of the beneficiaries under a will. The court referred to it as a "trust fund." In each case there was an *actual identifiable fund* under the control of the court upon which attorneys' fees could be impressed.

Here, no such fund has been created from which beneficiaries may draw in common, upon which attorneys' fees may be impressed, or from which those fees may be paid so that all who benefit may share equally in the payment of fees. The only source from which attorneys' fees might be drawn would be a legislatively imposed tax. The cited cases are inapposite.

Respondents next rely on the "common benefit/common fund" theory. This theory requires the litigation to both *benefit others* as well as the litigant *and* also to protect, preserve, or create a *common fund. Crane Towing Co. v. Gorton, supra* at 176–77; *Hsu Ying Li v. Tang, supra* at 799. Without question, respondents have benefited a substantial class. Yet, they have not protected, preserved, or created an existing common fund. To the contrary, an unchallenged finding of fact recognizes that respondents have assured for *the future* that "the state *will* preserve or create, or *cause to be* preserved or created, a common fund . . ." (Italics ours.) Having failed to protect, preserve or create an *immediate* fund from which reasonable attorneys' fees may be awarded, respondents are not entitled to such fees under the "common benefit/common fund" theory. *See also Weiss v. Bruno,* 83 Wn.2d 911, 914, 523 P.2d 915 (1974).

Nonetheless, respondents argue that there is an exception to the "common benefit/common fund" theory which

permits such fees even though no specific monetary fund has been preserved, protected or created. Respondents rely upon *Hsu Ying Li v. Tang, supra; PUD 1 v. Kottsick,* 86 Wn.2d 388, 545 P.2d 1 (1976); and *Weiss v. Bruno,* 83 Wn.2d 911, 523 P.2d 915 (1974).

Although the broad language in *Hsu* superficially supports respondents' contention, it is not in point. First, *Hsu* (like *Drain* and *Hein*) was an action between *private* litigants involving neither the *State* nor *State* funds. Second, in the instant case, there is no allegation or proof of constructive fraud such as that which supported the award of attorneys' fees in *Hsu Ying Li v. Tang, supra. See generally PUD 1 v. Kottsick, supra* at 930; *State ex rel. Macri v. Bremerton,* 8 Wn.2d 93, 113, 111 P.2d 612 (1941). *See also Fiorito v. Goerig, supra* at 618.

Respondents' reliance upon *Kottsick* is equally without merit. In *Kottsick* we said at pages 390–91:

> The appellants also claim that they fall within the "common fund" exception to the no–attorney–fees rule. We first applied this exception to cases where the litigant preserved or created a *specific monetary fund* for the benefit of others as well as himself. . . . This court broadened the exception in that it is no longer limited to situations where the litigant preserved or created a *specific monetary fund.* The exception now extends to situations where the litigant confers a substantial benefit on an ascertainable class.

(Italics ours.) Respondents rely too heavily upon the phrase "specific monetary fund" in addition to taking it out of context. By eliminating the need for a specific *monetary* fund, we did not eliminate the need for accumulating, preserving, or creating a *common* fund. *Kottsick,* and the cases upon which it relies, merely eliminate the need to create a *monetary* common fund. *Kottsick* does not eliminate the need to create a *common fund* from which attorneys' fees may be drawn to justify an award of such fees. The common fund may be monetary; it may be the enrichment of a corporation by securing the return of the value of stocks and bonds as in *Baker v. Seattle–Tacoma Power Co.,* 61

Wash. 578, 112 P. 647 (1911); the common fund also may be preservation of funds by forcing proper accounting and bookkeeping procedures as in *Grein v. Cavano,* 61 Wn.2d 498, 379 P.2d 209 (1963); but there must be an immediate *common fund* from which attorneys' fees may be drawn. *See generally Crane Towing, Inc. v. Gorton, supra; Swift v. Island County, supra.*

*Weiss v. Bruno, supra,* is presented as another variation of the "common benefit/common fund" concept that might permit respondents to recover reasonable attorneys' fees. Respondents point out that in *Weiss* the successful litigant did not benefit a truly ascertainable class. The class benefited was "all taxpayers."

In *Weiss,* the award of attorneys' fees was authorized on *four very narrowly defined grounds:*

> (1) *a successful suit brought by petitioners* (2) *challenging the expenditure of public funds* (3) made pursuant to patently unconstitutional legislative and administrative actions (4) following a refusal by the appropriate official and agency to maintain such a challenge.

(Italics ours.) *Weiss v. Bruno, supra* at 914. Thereafter, in *PUD 1 v. Kottsick, supra* at 391–92, we clarified the *Weiss v. Bruno* variation by recognizing its applicability only if all four narrowly defined requirements were met. Upon failing to find that *all four* requirements were met in *Kottsick,* we determined that appellants therein were not entitled to attorneys' fees "under the limited circumstances of *Weiss.*" Here, as in *Kottsick,* we must conclude that respondents are not entitled to attorneys' fees under the limited circumstances of *Weiss.* In *Weiss,* the litigants met requirements (1) and (2) by successfully and permanently halting the disbursement of public funds.

Here, respondents were successful litigants and thus have met the first requirement of *Weiss.* However, there was no challenge to the expenditure of public funds and also *no saving or preserving of any fund.* On the contrary, this lawsuit has had the opposite effect. It started a flow of

funds *from* the *State treasury.* Thus, while the "public spirited act" is to be commended, it does not fall within the "limited circumstances of *Weiss.*" *PUD 1 v. Kottsick, supra* at 391–92. As we indicated in *Swift v. Island County,* 87 Wn.2d 348, 363, 552 P.2d 174 (1976), the "common fund" theory "allows for an award of attorneys' fees out of a fund created or preserved by a litigant for the benefit of a class of persons." Here there is no such fund. *See Crane Towing Co. v. Gorton, supra* at 176–77:

> As the name implies, the "common fund" doctrine requires the prevailing party to have brought suit to preserve or protect a fund which benefits the party and others. Even if respondents had prevailed here, no fund exists out of which attorney fees might be granted.

Having failed to preserve, protect or accumulate any common fund, respondents are not entitled to be awarded their reasonable attorneys' fees under the "common benefit/common fund" theory. Nor is there a finding of bad faith, fraud or wantonness on the part of appellants to justify such an award under *PUD 1 v. Kottsick, supra* at 390. Accordingly, we affirm the trial court's denial of reasonable attorneys' fees.

WRIGHT, C.J., and BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

UTTER, J. (concurring)—I concur in the majority opinion but on the limited ground that the State has not met its constitutional duty to fund ample education in a general and uniform way.

The testimony in this case establishes that by any standard definition of educational quality the State's contributions to school finance have been inadequate. Due to the State's abandonment of its responsibilities in this area, local school systems have been forced to submit a large percentage of their budgets to local voting, a fact which has jeopardized the fairness of the State's educational system.

Under the ensuing system of local levies, the local educational program may not reflect children's needs, but rather local wealth and taste, and the size of the local school property tax base. Consequent variations in district budgets are inconsistent with the fair and uniform system of education contemplated by the constitution. For these reasons the trial court's decision prohibiting heavy reliance on special levies should be affirmed.

In affirming the judgment of the trial court, I would find local school districts may not be financed by a funding scheme whereby any substantial part[21] of the total school budget is subject to local veto. I would ground this conclusion upon the constitutional imposition of a duty upon the *State* to make ample provision for education of the state's children, Const. art. 9, § 1, together with the requirement that the education be provided through a "*general and uniform* system of public schools." (Italics mine.) Const. art. 9, § 2.

These constitutional provisions are not the nullity appellants would make of them. I share the majority's view that section 1 guarantees a right of education to the state's children. Though for reasons discussed below I would not now seek to define precisely the contours of that right; the provision makes clear that this education must be provided

---

[21]The legislature, in adopting the 1977 school finance legislation discussed later in the text, was of the opinion that a "lid" of 10 percent upon local contributions to the school budget comports with the constitutional mandate of uniformity. I am inclined to believe this is so, as local variations in need may justify a limited local effort to supplement state funds. While such a view appears to compromise the constitutional command, I believe it reflects a necessary balancing of state responsibilities with practical educational planning. In a similar vein, the United States Supreme Court has held that small variation in population size of state legislative districts is not abhorrent to constitutional guaranties of equal popular representation. *See Mahan v. Howell,* 410 U.S. 315, 35 L. Ed. 2d 320, 93 S. Ct. 979 (1973); *Gaffney v. Cummings,* 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973); *compare Reynolds v. Sims,* 377 U.S. 533, 579, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964) ("So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal–population principle are constitutionally permissible . . .") At any rate, the constitutionality of the 1977 legislation cannot properly be determined in the present proceeding.

"without distinction or preference" among the state's children. The companion provision, section 2, is equally explicit, and requires that there be uniformity in the state's educational system. These provisions together contemplate an educational system in which, to the extent practical through statewide planning and financial support, each child is afforded an equal opportunity to learn, regardless of differences in his or her family and community resources. The system of local levy financing challenged here is an anathema to the egalitarian promise of these provisions, violating them in both letter and spirit.

Having found the challenged system to be unconstitutional, I should not reach beyond such a holding to find with the majority that the constitution mandates a specific "basic education" be provided to the state's children. For the court to cast in terms of a constitutional doctrine the meaning of this term properly subjects it to the criticism voiced by the dissent, and deprives the people of this state of a continuing legislative and political dialogue on what constitutes a proper education.

A limited holding is particularly appropriate at this time due to the vigor with which the legislature addressed its responsibility through the school finance legislation of 1977. That legislation is contained in three acts—the Washington Basic Education Act of 1977, Laws of 1977, 1st Ex. Sess., ch. 359; the "Levy Lid" Act, Laws of 1977, 1st Ex. Sess., ch. 325; and sections 94, 96, and 97 of the State Operating Budget, Laws of 1977, 1st Ex. Sess., ch. 339.

During argument of this case counsel for respondent was asked whether this suit would have been brought had the legislation now enacted been in existence at the outset. The answer was equivocal, counsel conceding he could "see why we might not have brought it." It is easy to see why he must make such a concession. The legislation enacted by the 1977 legislature is comprehensive.

First, where the old legislative scheme provided no detailed definition of the educational program to be offered students, the current legislation provides such a definition.

The Basic Education Act defines the program evolving from the act to include a complex series of goals enumerated therein,[22] and the program requirements deemed necessary to accomplish these goals,[23] as well as the legislative determination of state resources to implement the program. Laws of 1977, 1st Ex. Sess., ch. 359, § 1.

---

[22] "The goal of the Basic Education Act for the schools of the state of Washington set forth in this 1977 amendatory act shall be to provide students with the opportunity to achieve those skills which are generally recognized as requisite to learning. Those skills shall include the ability:

"(1) To distinguish, interpret and make use of words, numbers and other symbols, including sound, colors, shapes and textures;

"(2) To organize words and other symbols into acceptable verbal and non-verbal forms of expression, and numbers into their appropriate functions;

"(3) To perform intellectual functions such as problem solving, decision making, goal setting, selecting, planning, predicting, experimenting, ordering and evaluating; and

"(4) To use various muscles necessary for coordinating physical and mental functions." Laws of 1977, 1st Ex. Sess., ch. 359, § 2.

[23] "(2) Satisfaction of the basic education goal identified in section 2 of this 1977 amendatory act shall be considered to be implemented by the following program requirements:

"(a) Each school district shall make available to students in kindergarten at least a total program offering of four hundred fifty hours. The program shall include reading, arithmetic, language skills and such other subjects and such activities as the school district shall determine to be appropriate for the education of the school district's students enrolled in such program;

"(b) Each school district shall make available to students in grades one through three, at least a total program hour offering of two thousand seven hundred hours. A minimum of ninety–five percent of the total program hour offerings shall be in the basic skills areas of reading/language arts, mathematics, social studies, science, music, art, health and physical education. The remaining five percent of the total program hour offerings may include foreign languages, or such subjects and activities as the school district shall determine to be appropriate for the education of the school district's students in such grades;

"(c) Each school district shall make available to students in grades four through six at least a total program hour offering of two thousand nine hundred seventy hours. A minimum of ninety percent of the total program hour offerings shall be in the basic skills areas of reading/language arts, mathematics, social studies, science, music, art, health and physical education. A minimum of five percent of the total program hour offerings shall be in the area of work skills. The remaining five percent of the total program hour offerings may include foreign languages, or such subjects and activities as the school district shall determine to be appropriate for the education of the school district's students in such grades;

Second, where the old scheme provided no legislative standards for staffing ratios and salary structures, the current legislation addresses the issues of staffing ratios and salary structures and establishes procedures by which these ratios and structures are to be determined. This is accomplished through a directive to the Governor and Superintendent of Public Instruction to develop a formula for legislative determination of a "basic education allocation" reflecting appropriate staffing ratios and staff costs, Basic Education Act, § 5 (see Appendix A), and through specific staffing and salary guidelines enunciated in the budget, State Operating Budget, § 97(1) (see Appendix B).

Finally, where the old scheme provided no control at all on the amount of excess levies a district might be asked to

---

"(d) Each school district shall make available to students in grades seven through eight, at least a total program hour offering of one thousand nine hundred eighty hours. A minimum of eighty–five percent of the total program hour offerings shall be in the basic skills areas of reading/language arts, mathematics, social studies, science, music, art, health and physical education. A minimum of ten percent of the total program hour offerings shall be in the area of work skills. The remaining five percent of the total program hour offerings may include foreign language, or such subjects and activities as the school district shall determine to be appropriate for the education of the school district's students in such grades;

"(e) Each school district shall make available to students in grades nine through twelve at least a total program hour offering of four thousand three hundred twenty hours. A minimum of sixty percent of the total program hour offerings shall be in the basic skills areas of language arts, mathematics, social studies, science, music, art, health and physical education. A minimum of twenty percent of the total program hour offerings shall be in the area of work skills. The remaining twenty percent of the total program hour offerings may include traffic safety, foreign language, or such subjects and activities as the school district shall determine to be appropriate for the education of the school district's students in such grades, with not less than one–half thereof in basic skills and/or work skills.

"Nothing contained in subsection (2) of this section shall be construed to require individual students to attend school for any particular number of hours per day or take any particular courses.

"Each school district's basic educational program shall be accessible to all students between the ages of five and twenty–one years of age and shall consist of a minimum of one hundred eighty school days per school year in such grades as are conducted by a school district, and one hundred eighty half–days of instruction, or equivalent, in kindergarten. The state board of education pursuant to its authority in RCW 28A.04.120 and 28A.41.130, as now or hereafter amended, shall adopt the necessary rules and regulations to ensure program compliance with the provisions of this section." Laws of 1977, 1st Ex. Sess., ch. 359, § 3(2).

approve, a deficiency which lies at the root of the controversy before us in this case, the current legislation provides a permanent lid of 10 percent (beginning in the 1980–81 school year) upon the extent of local levy contribution to the local school district budget, "Levy Lid" Act (see Appendix C). And at the same time, through allocation of funds the legislation over time would equalize compensation schedules among the districts, State Operating Budget, § 96 (see Appendix D).

I have undertaken to delineate in limited form the scope of the legislature's efforts in 1977 to emphasize the lack of necessity for this court to act on the scale it has in the majority opinion. These legislative achievements substantially remedy deficiencies in the funding system here at issue.

The majority, in noting the passage of this legislation in footnote 14, apparently assumes we cannot even consider the effect of this legislation in rendering our judgment here. I do not share the view that we cannot consider extensive action taken by the legislature during the pendency of this appeal. Although I agree that we do not and should not render advisory opinions, I do not see how this rule applies where, as here, we have real parties and real controversy affected by currently effective changes in the laws applicable to the issues raised on this appeal.

This court has often sustained the proposition that the law governing a case on appeal is that applicable at the time of the disposition of the appeal, not that existing at the time of the trial court's decision. We have recognized and given effect to change in the law in civil cases, *see Samuelson v. Freeman,* 75 Wn.2d 894, 454 P.2d 406 (1969); *Denison v. Goforth,* 75 Wn.2d 853, 454 P.2d 218 (1969); *Federal Shopping Way, Inc. v. O.K. Ins. Agency, Inc.,* 78 Wn.2d 903, 481 P.2d 5 (1971); *Spear v. Bremerton,* 95 Wash. 264, 163 P. 741 (1917); and in criminal cases, *see Beard v. Conte,* 78 Wn.2d 902, 480 P.2d 488 (1971). That rule applies to changes caused by judicial decisions, *see*

*Samuelson* and *Denison,* and those brought about by statute, *see Federal Shopping Way, Beard,* and *Spear.*

The majority at page 519 refers to the "Legislature's obligation as one to provide 'basic education' through a basic program of education as distinguished from total 'education' or all other 'educational' programs, subjects, or services which might be offered." It is precisely this unnecessary intrusion in this detail that I believe goes beyond what we must decide as a matter of constitutional necessity.

Moreover, we noted in *In re Juvenile Director,* 87 Wn.2d 232, 243, 552 P.2d 163 (1976), that "[t]he spirit of reciprocity and interdependence requires that if checks by one branch undermine the operation of another . . . those checks are improper and destructive exercises of the authority." Here the legislature has acted responsibly and exhaustively through its own uniquely constituted fact-finding and opinion gathering processes. Given that we may fully discharge our responsibility to adjudicate the controversy before us without intervening unnecessarily in a legislative process ably completed, the above enunciated principle[24] mandates that we do so.

## APPENDIX A

Laws of 1977, 1st Ex. Sess., ch. 359, § 5:

The basic education allocation for each annual average full time equivalent student shall be determined in accordance with the following procedures:

The governor shall and the superintendent of public instruction may recommend to the legislature a formula based on a ratio of students to staff for the distribution of a basic education allocation for each annual average full time equivalent student enrolled in a common school. The

---

[24]The same result is dictated by the jurisprudential maxim that a court "is under duty to dispose of a controversy within the narrowest confines that intellectual integrity permits." *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 149–50, 95 L. Ed. 817, 71 S. Ct. 624 (1950) (Frankfurter, J., concurring). As at present there is no need to give constitutional definition to the words "ample" or "provision" or to construe and interpret "basic education" as distinguished from other educational programs, such superfluous judgment should be avoided.

distribution formula shall have the primary objective of equalizing educational opportunities and shall provide appropriate recognition of the following costs among the various districts within the state:

(1) Certified staff and their related costs;

(2) Classified staff and their related costs;

(3) Nonsalary costs; and

(4) Extraordinary costs of remote and necessary schools and small high schools.

This formula for distribution of basic education funds shall be reviewed biennially by the superintendent and governor. The recommended formula shall be subject to approval, amendment or rejection by the legislature. Commencing with the 1980–81 school year, the formula adopted by the legislature shall reflect a ratio of not less than fifty certificated personnel to one thousand annual average full time equivalent students and one classified person to three certificated personnel. In the event the legislature rejects the distribution formula recommended by the governor, without adopting a new distribution formula, the distribution formula for the previous biennium shall remain in effect: PROVIDED, That the distribution formula developed pursuant to this section shall be for state apportionment and equalization purposes only and shall not be construed as mandating specific operational functions of local school districts other than those program requirements identified in section 3 of this 1977 amendatory act. The enrollment of any district shall be the annual average number of full time equivalent students and part time students as provided in RCW 28A.41.145, as now or hereafter amended, enrolled on the first school day of each month. The definition of full time equivalent student shall be determined by rules and regulations of the superintendent of public instruction: PROVIDED, That the definition shall be included as part of the superintendent's biennial budget request: PROVIDED, FURTHER, That any revision of the present definition shall not take effect until approved by the house appropriations committee and the senate ways and means committee: PROVIDED, FURTHER, That the office of program planning and fiscal management shall make a monthly review of the superintendent's reported full time equivalent students in the common schools in conjunction with RCW 43.62.050.

Certificated staff shall include those persons employed by a school district in a teaching, instructional, administrative or supervisory capacity and who hold positions as certificated employees as defined under RCW 28A.01.130, as now or hereafter amended, and every school district superintendent, and any person hired in any manner to fill a position designated as, or which is in fact, that of deputy superintendent or assistant superintendent: PROVIDED, That in exceptional cases, people of unusual competence but without certification may teach students so long

as a certificated person exercises general supervision: PROVIDED, FURTHER, That the hiring of such noncertificated people shall not occur during a labor dispute and such noncertificated people shall not be hired to replace certificated employees during a labor dispute: PROVIDED, FURTHER, That the hiring of such noncertificated persons shall be subject to disapproval by the superintendent of public instruction. Annual written statements shall be submitted to the office of the superintendent of public instruction reporting and explaining such circumstances. Annual average full time equivalent certificated classroom teacher's direct classroom contact hours shall be at least twenty–five hours per week. Classroom contact hours shall be exclusive of time required to be spent for preparation, conferences, or any other nonclassroom instruction duties. Classified staff shall include those persons employed by a school district other than certificated staff as defined in this section in a capacity for which certification is not required.

## APPENDIX B

Laws of 1977, 1st Ex. Sess., ch. 339, § 97(1):

(1) The allocation of moneys for a basic education allocation per annual average full time equivalent student for the 1978–79 school year in each school district shall be determined by the superintendent of public instruction as follows: PROVIDED, That such basic education allocation so determined shall be converted and distributed on an annual average full time equivalent student basis:

(a) Respecting certificated employees: A numerical allocation of one certificated staff unit shall be established for each average annual twenty–three and one–half full time equivalent kindergarten, elementary, and secondary students;

(b) Respecting certificated employees: A numerical allocation of one certificated staff unit shall be established for each average annual nineteen and six–tenths full time equivalent students enrolled in a vocational education program approved by the superintendent of public instruction;

(c) Respecting certificated employees: Numerical allocations of certificated staff units shall be established for districts enrolling not more than one hundred average annual full time equivalent students and for small school plants within any school district, which such districts or small plants have been judged to be remote and necessary by the state board of education as follows:

(i) For grades K–6, for enrollments of not more than sixty annual average full time equivalent students, two and one–half certificated staff units;

(ii) For grades K–6, for enrollments above sixty annual average full time equivalent students, additional certificated staff units based upon a ratio of one certificated staff unit per twenty-three and one–half annual average full time equivalent students;

(iii) For grades 7 and 8, for enrollments of not more than twenty annual average full time equivalent students, eighty–five hundredths certificated staff unit;

(iv) For grades 7 and 8, for enrollments above twenty annual average full time equivalent students, additional certificated staff units based upon a ratio of one certificated staff unit per twenty–three and one–half annual average full time equivalent students.

(d) Respecting certificated employees: Numerical allocations of certificated staff units shall be established for districts operating high schools with enrollments of not more than three hundred average annual full time equivalent students as follows:

(i) Eight and one–tenth certificated staff units for the first sixty annual average full time equivalent students;

(ii) Additional certificated staff units based upon a ratio of eighty–five hundredths certificated staff unit per forty–three and one–half average annual full time equivalent students;

(e) Compensation including benefits shall be calculated as herein provided for certificated staff units generated in subsections (a) through (d) above as follows:

(i) For the purposes of this subsection each district's 1977–78 average compensation levels including benefits shall mean such district's 1976–77 average compensation including benefits increased pursuant to section 96(1) of this act. "Maximum control levels" shall mean the "maximum control levels" established in section 96(1) of the act increased by four percent:

(ii) Compensation including benefits for those school districts whose 1977–78 average certificated compensation level including benefits is above the 1977–78 state average compensation level including benefits will be calculated on the basis of the 1977–78 district average compensation level including benefits increased by six percent: PROVIDED, That no district shall receive in excess of the "maximum control level".

(iii) Compensation including benefits for those school districts whose 1977–78 average certificated compensation level including benefits is below the 1977–78 state average compensation level including benefits will be calculated by utilizing the 1977–78 district average compensation level including benefits increased by nine percent up to an amount not to exceed a six

percent for any school district above the state average: PRO-VIDED, That for such districts the superintendent of public instruction shall utilize, pursuant to the provisions of section 4, chapter ... (SHB 1086), Laws of 1977 1st ex. sess., the actual 1977-78 compensation level including benefits for the purpose of calculating the entitlement for compensation including benefits increases as provided for in this subsection.

(f) The total basic education allocation for certificated employees shall be established for each district by using the salary deter-minations established in subsection (e) above multiplied by the numerical allocations determined in subsections (a), (b), (c), and (d) above.

(g) Respecting classified employees: A numerical allocation of one classified staff unit for each three certificated staff units as computed for the purposes of subsections (a), (c) and (d) above for each school district shall be established. Compensation including benefits shall be calculated as herein provided for classified staff units generated in this subsection as follows:

(i) For the purposes of this subsection each district's 1977-78 average compensation levels including benefits shall mean such district's 1976-77 average compensation including benefits increased pursuant to section 96(1) of this act. "Maximum con-trol levels" shall mean the "maximum control levels" estab-lished in section 96(1) of this act increased by four percent:

(ii) Compensation including benefits for those school districts whose 1977-78 average classified compensation level including benefits is above the 1977-78 state average compensation level including benefits will be calculated on the basis of the 1977-78 district average compensation level including benefits increased by six percent: PROVIDED, That no district shall receive in excess of the "maximum control level".

(iii) Compensation including benefits for those school districts whose 1977-78 average classified compensation level including benefits is below the 1977-78 state average compensation level including benefits will be calculated by utilizing the 1977-78 district average compensation level including benefits increased by nine percent up to an amount not to exceed a six percent for any school district above the state average: PROVIDED, That for such districts the superintendent of public instruction shall uti-lize, pursuant to the provisions of section 4, chapter ... (SHB 1086), Laws of 1977 1st ex sess., the actual 1977-78 compensa-tion level including benefits for the purpose of calculating the entitlement for compensation including benefits increases as provided for in this subsection.

(h) The total basic education allocation for classified employees shall be established for each district by using the salary determination referred to in subsection (g) above multiplied by the numerical allocation established in subsection (g) above. In addition, each school district shall receive as part of the basic education allocation, for classified employee benefits, an amount to reimburse such district for their payments to the old–age and survivors insurance system embodied in the social security act, for employee retirement, industrial insurance, or any other benefit program mandated by the legislature for their classified staff units.

(i) Respecting nonemployee related costs: The allocation of additional moneys for nonemployee related costs for 1978–79 school year shall utilize the number of certificated staff units as computed for the purposes of subsections (a), (c), and (d) above, multiplied by $3,650 for each such certificated staff unit.

## APPENDIX C

Laws of 1977, 1st Ex. Sess., ch. 325:

### CHAPTER 325
[House Bill No. 1086]
SCHOOL DISTRICTS—EXCESS LEVIES

AN ACT Relating to revenue and taxation; amending section 84.52.052, chapter 15, Laws of 1961 as last amended by section 1, chapter 4, Laws of 1977 and RCW 84.52.052; amending section 84.52.054, chapter 15, Laws of 1961 as last amended by section 2, chapter 4, Laws of 1977 and RCW 84.52.054; adding new sections to chapter 15, Laws of 1961 and to chapter 84.52 RCW; prescribing an effective date; and declaring an emergency.

Be it enacted by the Legislature of the State of Washington:

Section 1. Section 84.52.052, chapter 15, Laws of 1961 as last amended by section 1, chapter 4, Laws of 1977 and RCW 84.52.052 are each amended to read as follows:

The limitations imposed by RCW 84.52.050 through 84.52.056, and RCW 84.52.043 shall not prevent the levy of additional taxes by any taxing district except school districts in which a larger levy is necessary in order to prevent the impairment of the obligation of contracts. Any county, ((school district,)) metropolitan park district, park and recreation district in class AA counties and counties of the second, eighth and ninth class, sewer district, water district, public hospital district, rural county library district, intercounty rural library district, fire protection district, cemetery district, city or town may levy taxes at a rate in excess of the rate specified in RCW 84.52.050 through 84.52.056 and RCW

84.52.043, or RCW 84.55.010 through 84.55.050, when authorized so to do by the electors of such county, ((school district,)) metropolitan park district, park and recreation district in class AA counties and counties of the second, eighth and ninth class, sewer district, water district, public hospital district, rural county library district, intercounty rural library district, fire protection district, cemetery district, city or town in the manner set forth in Article VII, section 2(a) of the Constitution of this state, as amended by Amendment 59 and as thereafter amended, at a special or general election to be held in the year in which the levy is made ((or, in the case of a proposition authorizing levies for support of a school district for a two-year period, at a special or general election to be held in the year in which the first annual levy is made: PROVIDED, That once additional tax levies have been authorized for the support of a school district for a two-year period, no further additional tax levies for the support of the district for that period may be authorized except for expenditures attributable to an unanticipated increase in student enrollment and for the acquisition of motor vehicles for student transportation)).

A special election may be called and the time therefor fixed by the board of county commissioners or other county legislative authority, ((board of school directors,)) or council, board of commissioners or other governing body of any metropolitan park district, park and recreation district in class AA counties and counties of the second, eighth and ninth class, sewer district, water district, public hospital district, rural county library district, intercounty rural library district, fire protection district, cemetery district, city or town, by giving notice thereof by publication in the manner provided by law for giving notices of general elections, at which special election the proposition authorizing such excess levy shall be submitted in such form as to enable the voters favoring the proposition to vote "yes" and those opposed thereto to vote "no".

Sec. 2. Section 84.52.054, chapter 15, Laws of 1961 as last amended by section 2, chapter 4, Laws of 1977 and RCW 84.52.054 are each amended to read as follows:

The additional tax provided for in subparagraph (a) of the seventeenth amendment to the state Constitution as amended by Amendment 59 and as thereafter amended, and specifically authorized by RCW 84.52.052, as now or hereafter amended, and section 3 and 4 of this amendatory act, shall be set forth in terms of dollars on the ballot of the proposition to be submitted to the voters, together with an estimate of the dollar rate of tax levy that will be required to produce the dollar amount; and the county assessor, in spreading this tax upon the rolls, shall determine the eventual dollar rate required to produce the amount of dollars so voted upon, regardless of the estimate of dollar rate of tax

levy carried in said proposition. In the case of a school district proposition for a two year period, the dollar amount and the corresponding estimate of the dollar rate of tax levy shall be set forth for each of the two years. The dollar amount for each of the two annual levies may be equal or in different amounts.

NEW SECTION. Sec. 3. There is added to chapter 15, Laws of 1961 and to chapter 84.52 RCW a new section to read as follows:

The limitations imposed by RCW 84.52.050 through 84.52.056, and RCW 84.52.043 shall not prevent the levy of additional taxes by school districts, when authorized so to do by the electors of such school district in the manner set forth in Article VII, section 2(a) of the Constitution of this state, as amended by Amendment 59 and as thereafter amended, at a special or general election to be held in the year in which the levy is made or, in the case of a proposition authorizing levies for support of a school district for a two year period, at a special or general election to be held in the year in which the first annual levy is made: PROVIDED, That once additional tax levies have been authorized for the support of a school district for a two year period, no further additional tax levies for the support of the district for that period may be authorized.

A special election may be called and the time therefor fixed by the board of school directors, by giving notice thereof by publication in the manner provided by law for giving notices of general elections, at which special election the proposition authorizing such excess levy shall be submitted in such form as to enable the voters favoring the proposition to vote "yes" and those opposed thereto to vote "no".

NEW SECTION. Sec. 4. There is added to chapter 15, Laws of 1961, and to chapter 84.52 RCW a new section to read as follows:

The maximum dollar amount which may be levied by or for any school district for maintenance and operation support under the provisions of section 3 of this amendatory act shall be as follows:

(1) For excess levies in 1977 for collection in 1978:

To the extent that any district receives funds through the state apportionment formula in excess of the amount anticipated by such a district when it established its excess levy for collection in 1978 and when such excess can be utilized to relieve special levy burdens, then such a district should place a first priority on reducing its special levy.

(2) For excess levies in 1977 for collection in 1979; for excess levies in 1978 for collection in 1979 and thereafter, the sum of:

(a) That amount equal to ten percent of each school district's prior year basic education allocation converted to one hundred percent of formula; plus

(b) That amount equal to each school district's prior year basic education allocation converted to one hundred percent of formula minus each school district's basic education allocation for such school year.

(3) Excess levies authorized under this 1977 amendatory act or under RCW 84.52.052 shall not be used to increase the average compensation for certificated or classified personnel in any school district: PROVIDED, That those school districts which receive state funds budgeted for a four percent increase in average compensation for certificated or classified personnel respectively shall be allowed to increase such certificated or classified compensation by an amount equal to the percentage increase in the prior year's United States Consumer Price Index minus the state funded four percent, or by an additional two percent, whichever is less: PROVIDED FURTHER, That any school district whose average compensation for certificated or classified personnel respectively is below statewide average compensation level for certificated or classified personnel during the preceding school year, may collect and expend property taxes authorized by this 1977 amendatory act, or under RCW 84.52.052, for the purpose of increasing such district average compensation for certificated or classified personnel up to but not to exceed the statewide average compensation for certificated or classified personnel for the preceding school year: PROVIDED FURTHER, That those contracts which have been negotiated prior to the effective date of this 1977 amendatory act by those school districts for such school year shall not be abrogated by this 1977 amendatory act.

(4) For the purpose of the section, the basic education allocation shall be determined pursuant to RCW 28A.41.130, 28A.41.140, and 28A.41-.145, as now or hereafter amended.

"Compensation" for the purposes of this 1977 amendatory act shall mean one hundred and seven percent of each school district's respective average salary for certificated personnel, and one hundred and fourteen percent of each school district's respective average salary for classified personnel.

Certificated personnel shall include those persons employed by a school district in a teaching, instructional, administrative or supervisory capacity and who hold positions as certificated personnel as defined under RCW 28A.01.130, as now or hereafter amended, and every school district superintendent, and any person hired in any manner to fill a position designated as, or which is in fact, that of deputy superintendent or assistant superintendent. Classified personnel shall include those persons employed by a school district other than certificated personnel as defined in this section in a capacity for which certification is not required.

For the purpose of subsection (2) of this section, the superintendent of public instruction may grant local school districts authority to exceed the

levy limitations imposed by said subsection: PROVIDED, That said limitations can only be exceeded by an amount that will insure local school districts the ability to raise a total excess levy dollar amount per annual average full time equivalent student which when combined with the basic education allocation is equal to but does not exceed one hundred and four percent of the previous school year's comparable dollars per annual average full time equivalent student.

The superintendent of public instruction shall develop rules and regulations and inform school districts of the pertinent data necessary to carry out the provisions of this 1977 amendatory act.

NEW SECTION. Sec. 5. If any provision of this 1977 amendatory act, or its application to any person or circumstance is held invalid, the remainder of the act, or the application of the provision to other persons or circumstances is not affected.

NEW SECTION. Sec. 6. This 1977 amendatory act is necessary for the immediate preservation of the public peace, health, and safety, the support of the state government and its existing public institutions, and shall take effect July 1, 1977.

Passed the House June 19, 1977.
Passed the Senate June 19, 1977.
Approved by the Governor June 30, 1977.
Filed in Office of Secretary of State June 30, 1977.

APPENDIX D

Laws of 1977, 1st Ex. Sess., ch. 339, § 96:

NEW SECTION. Sec. 96. FOR THE SUPERINTENDENT OF PUBLIC INSTRUCTION—GENERAL APPORTIONMENT FOR FISCAL YEAR 1978
General Fund Appropriation:
 For General Appropriation ........................ $670,100,000
 Total Appropriation ............................ $670,100,000

The appropriation contained in this section shall be subject to the following conditions and limitations:

(1) Of the appropriation contained in this section the superintendent is hereby authorized to distribute up to $33,000,000 for compensation including benefit increases for certificated and classified staff in the common schools starting September 1, 1977. For the purpose of distributing these funds, the superintendent of public instruction shall determine the state maximum school district average compensation level including benefits for certificated staff for the 1976–77 school year and the state maximum school district average compensation level including benefits for classified staff for the 1976–77 school year.

Such state maximum compensation levels including benefits increased by four percent shall be the "maximum control levels" for certificated and classified staff for the purposes of this section.

For the purpose of distributing these funds for the 1977–78 school year, each school district shall receive average compensation level including benefit increases for certificated and classified staff respectively as follows:

(a) Those school districts whose district average compensation level including benefits is above the state average compensation level including benefits for 1976–77, shall receive a six percent increase above the 1976–77 average compensation level including benefits: PROVIDED, That no district shall receive an increase which would raise average compensation levels including benefits above the "maximum control level" so defined.

(b) Those school districts whose district average compensation level including benefits is below the state average compensation level including benefits for 1976–77, shall receive a nine percent increase above the 1976–77 average compensation levels up to an amount not to exceed six percent above the state average compensation level including benefits for 1976–77.

(2) The superintendent of public instruction is hereby authorized to direct from the moneys available for distribution pursuant to and under the conditions of subsection (1) of this section, such funds as may be necessary to grant salary increases for certificated and classified employees funded through state funded categorical programs including Educational Service Districts.

(3) Compensation including benefit increases for classified and certificated staff supported by federal programs or traffic safety education funds shall be subject to the conditions of subsection (1) of this section and paid from the respective revenue source.

(4) The weighting schedule used by the superintendent of public instruction during the 1977–78 fiscal year in computing the apportionment of funds for each school district shall be based on the following factors:

(a) A base weighting factor of 1.0 for each full time equivalent student enrolled;

(b) An additional weighting factor of 1.0 for each full time equivalent student enrolled in vocational education in grades 9–12 which is approved by the superintendent of public instruction;

(c) Continuation of the weighting factors used by the superintendent of public instruction for the purpose of reimbursement to each school district for costs resulting from staff education and experience greater than the minimum requirements. The superintendent of public instruction shall employ the staff characteristic factor of the respective local districts established in the

immediately preceding school year for purposes of distribution during the 1977–78 fiscal year;

(d) An additional weighting factor of not more than 2.0 as determined by the superintendent of public instruction for school districts enrolling not more than 250 full time equivalent students in grades 9–12;

(e) An additional weighting factor of not more than 2.0 as determined by the superintendent of public instruction for nonhigh school districts enrolling not more than 100 full time equivalent students which districts have been judged to be remote and necessary by the state board of education;

(f) An additional weighting factor of not more than 2.0 as determined by the superintendent of public instruction for small school plants which are judged remote and necessary within any school district by the state board of education;

(g) An additional weighting factor for a period of not more than four years, for any consolidated school district formed after July 1, 1971, equal to the additional weighting factor in effect in each qualifying district during the school year immediately preceding consolidation, which district consists of one or more former school districts which were either remote and necessary or which contained not more than 250 students in grades 9–12;

(h) An additional weighting factor of 0.25 for full time equivalent students residing on tax exempt property as set forth in RCW 28A.41.140(6)(b) or (c); and

(i) An additional weighting factor of 0.25 for full time equivalent students in an approved interdistrict cooperative program as authorized by RCW 28A.41.140(6)(a) and 28A.58.075.

(5) During the 1977–78 school year the superintendent of public instruction shall distribute not more than $1,627,000 of the funds appropriated by this section, outside of the apportionment formula to school districts of which $480,000 shall be for the following purposes:

(a) To pay fire protection districts at a rate of $1.00 per year for each student attending a school located in an unincorporated area within a fire protection district as mandated by the provisions of RCW 52.36.020 by the expenditure of not more than $280,000;

(b) To pay for school district emergencies by the expenditure of not more than $200,000.

ROSELLINI, J. (dissenting)—In *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n*, 83 Wn.2d 523, 520 P.2d 162 (1974), this court unanimously declared that we are not a super legislature. The author of the

majority opinion in this case was among the signers. Now it appears that this principle, which recognizes a constitutional limitation of the court's powers, will not be adhered to in cases where a majority of the court finds it expedient or desirable to substitute its judgment for that of the legislature upon a matter of public policy.

Here the majority boldly usurps the legislative function, taking upon itself the right to decide what minimum education shall be provided the children of this state. It assumes the right to make this decision by virtue of a constitutional mandate. Assuming there is such a mandate, it is directed to the legislature and not to this court. The legislature being an autonomous branch of government answerable only to the people, it is for that body to determine how it will perform its constitutional duties.

The majority, however, evidently assumes that this department of government is for some reason more conscientious than the legislature, more capable of understanding the public needs and desires, and equipped with the necessary wisdom, knowledge and discretion to justify an order to the legislature, directing its judgment with respect to the educational requirements and the allocation of the revenues of the state. It does so ignoring entirely the detailed and complex provisions of the school law contained in RCW Title 28A.

The majority's action disturbs the legislature's constitutional power to decide what revenues shall be raised and how the funds in the public treasury shall be appropriated and allocated among the various offices, institutions, and services of the state.

If this opinion is given credence, the court has substituted its will for that of the people, which can only be expressed through their elected representatives, and has seriously impaired the functioning of our constitutional form of government.

I would be surprised to learn that the people of this state are willing to turn over to a tribunal against which they have little if any recourse, a matter of such grave concern to

them and upon which they hold so many strong, though conflicting views. If their legislators pass laws with which they disagree or refuse to act when the people think they should, they can make their dissatisfaction known at the polls. They can write to their representatives or appear before them and let their protests be heard. The court, however, is not so easy to reach (*see In re Juvenile Director,* 87 Wn.2d 232, 552 P.2d 163 (1976)) nor is it so easy to persuade that its judgment ought to be revised. A legislature may be a hard horse to harness, but it is not quite the stubborn mule that a court can be. Most importantly, the court is not designed or equipped to make public policy decisions, as this case so forcibly demonstrates.

This disturbing action is gratuitous. It is taken in a case where the evidence reveals no circumstances which would invite judicial intervention, much less compel it. The contention here is that the funds available to Seattle School District No. 1 for the year 1975–76 were inadequate to provide for the education of the children of the district. However, the evidence shows that in spite of the levy failure, the district held a surplus of $8 million when the costs of education for that year had been paid. The surplus would have been $9.8 million if the district had not chosen to pay employees discharged by reason of reduction in force ("riffed" staff) before payment was due them.

## IMPACT OF THE LEVY FAILURE

The surplus came about in the following manner. In its final budget for the 1975–76 school year, the district estimated the total expenditures for the school year in the amount of $112,635,483. However, only 94.2 percent of the budgeted amount was spent, and the total surplus amounted to $6.5 million. Further, the 1975–76 final budget underestimated total revenues by approximately $1.5 million, with the result that the total amount of surplus was approximately $8 million.

The examination of some historical trends will help to understand the effect of the 1975 excess levy failure.

The first trend is one of declining student enrollment. The second trend, during at least the first part of this 10–year period, was an actual increase in total staff rather than a proportional reduction to match the decreasing enrollment. This increase was mainly attributed to administrative and support staff, rather than teaching staff. At one point administrative and support staff actually became larger than the teaching staff and remained larger even during the 1975–76 school year, the first year impacted by the levy failure. The overall staff ratio did not start to decrease until the end of that school year.

Levy failure had the effect of eliminating salary increases for the 1975–76 school year for all the district's staff. This is by reason of the fact that the various collective bargaining agreements made salary increases for that year dependent upon either passage of the excess levy or a special legislative appropriation for salary increases, neither of which events occurred.

As to staffing, the levy failure had only a minimal effect.

In the following summary of evidence, terms have these meanings:

"Certificated staff" means those district employees, such as teachers, certain administrators, nurses, librarians, etc., who are required by law to have a state certificate to hold their position. "Classified staff" means simply those district employees who do not hold such certificates, and is synonymous with "noncertificated staff." It includes custodians, secretaries, etc.

"Categorical staff" means those employees, whether certificated or classified, who are associated with some federal or state program, such as the program for the handicapped. "Noncategorical staff" means those employees, whether certificated or classified, who are not associated with a categorical program and are sometimes referred to as "basic" staff.

Certificated staff ratios in the Seattle School District, whether for total staff or noncategorical staff only, vary lit-

tle from the statewide average.[25] However, classified staff ratios, whether for total staff or noncategorical staff only, are much richer in the district than in the state as a whole.

Although district employees, both certificated and classified, received no salary increases for 1975–76, average salaries for such employees were still above the statewide average. For certificated staff, the statewide average was $14,481, while the district average was $15,158. For classified staff, the statewide average was $9,412, while the district average was $10,583.

For districts with enrollment of 20,000 and over, the average certificated salary was $15,691, about $530 more than the Seattle average. However, for these same districts the average classified salary was $10,128, about $450 less than the Seattle average.

The pupil–staff ratio, taking all certificated staff into account, was 15.9 to 1 in 1974–75 and 17.9 to 1 in 1975–76, for an increase of *two* pupils per staff member.

Taking only noncategorical certificated staff into account, the respective ratios are 18.8 to 1, and 21.3 to 1, for an increase of 2.5 pupils per noncategorical staff member.

The pupil–classroom teacher ratio in 1974–75 was 20.5 to 1 and in 1975–76 it was 22.5 to 1, for an increase of *two* pupils per classroom teacher.

The pupil–staff ratio, taking all classified staff into account, was 25.68 to 1 in 1974–75 and 30.5 to 1 in 1975–76, for an increase of 4.8 pupils per staff member.

Taking only noncategorical classified staff into account, the respective ratios were 37.9 to 1 and 45.7 to 1, for an increase of 7.3 pupils per noncategorical staff member.

In short, the increases in the various pupil–staff ratios, especially in the pupil–classroom teacher ratio and the pupil–certificated staff ratio, were minimal.

What is the relationship between money and the quality of a child's education? Specifically, do the things that more money typically buys, *i.e.,* richer staffing ratios and higher

---

[25]With respect to certificated staff, the district fits the general pattern whether for the state as a whole or for districts over 20,000 enrollment.

salary levels for a district's staff, make a difference in terms of quality of education?

This precise issue was explored in 4 days of testimony by three of the Nation's leading experts on the subject: Dr. Walter I. Garms, Jr., of the University of Rochester; Dr. James Guthrie, of the University of California; and Dr. John Pincus, of the Rand Corporation and a member of the California State Board of Education. The first two witnesses were called by the district, and the third by the State.

Amazingly, all three experts agreed on the most important point: there is no scientific proof of a positive relationship between student achievement levels and various types of input, such as expenditures per pupil, student–teacher ratios, and staff salaries.

To summarize: (1) The district ended the 1975–76 school year with $8 million surplus, and if early payment had not been made to the "riffed" teachers the surplus would have been $9.8 million. (2) The average salary for certificated and classified employees was still above the state average. (3) The increase in pupil–staff ratios was minimal. (4) There is no scientific proof of a positive relationship between student achievement level and various types of input, such as expenditures per pupil, student–teacher ratios and staff salaries.

On this record the district has failed to prove that the funds available were not sufficient to discharge the State's duty to provide ample education for the resident children of this state.

## CONST. ART. 9

I am convinced that there is no justiciable controversy before the court. Accordingly, I do not think an examination of Const. art. 9 is necessary in this case. However, I will volunteer my own interpretation, the majority having treated the subject at some length. It has not seen fit to set forth the article under consideration, and consequently has ignored the fundamental principle that a constitutional

provision must be regarded as a whole, with effect being given to every part subjected to construction (*Sears v. Western Thrift Stores, Inc.*, 10 Wn.2d 372, 116 P.2d 756 (1941)), and that various provisions must be harmonized if possible. (*State ex rel. Wolfe v. Parmenter*, 50 Wash. 164, 96 P. 1047 (1908)). Although it is somewhat lengthy, I will quote the entire article, italicizing those phrases and sentences which refer to the legislature.

§ 1 PREAMBLE. It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex.

§ 2 PUBLIC SCHOOL SYSTEM. *The legislature shall provide for a general and uniform system of public schools. The public school system shall include common schools, and such high schools, normal schools, and technical schools as may hereafter be established.* But the entire revenue derived from the common school fund and the state tax for common schools shall be exclusively applied to the support of the common schools.

§ 3 FUNDS FOR SUPPORT. The principal of the common school fund as the same existed on June 30, 1965, shall remain permanent and irreducible. The said fund shall consist of the principal amount thereof existing on June 30, 1965, and such additions thereto as may be derived after June 30, 1965, from the following named sources, to wit: *Appropriations* and donations by the state to this fund; donations and bequests by individuals to the state or public for common schools; the proceeds of lands and other property which revert to the state by escheat and forfeiture; the proceeds of all property granted to the state when the purpose of the grant is not specified, or is uncertain; funds accumulated in the treasury of the state for the disbursement of which provision has not been made by law; the proceeds of the sale of stone, minerals, or property other than timber and other crops from school and state lands, other than those granted for specific purposes; all moneys received from persons appropriating stone, minerals or property other than timber and other crops from school and state lands other than those granted for specific purposes, and all moneys other than rental recovered from persons trespassing on said

lands; five per centum of the proceeds of the sale of public lands lying within the state, which shall be sold by the United States subsequent to the admission of the state into the Union as approved by section 13 of the act of congress enabling the admission of the state into the Union; the principal of all funds arising from the sale of lands and other property which have been, and hereafter may be granted to the state for the support of common schools. *The legislature may make further provisions for enlarging said fund.*

There is hereby established the common school construction fund to be used exclusively for the purpose of financing the construction of facilities for the common schools. The sources of said fund shall be: (1) Those proceeds derived from the sale or appropriation of timber and other crops from school and state lands subsequent to June 30, 1965, other than those granted for specific purposes; (2) the interest accruing on said permanent common school fund from and after July 1, 1967, together with all rentals and other revenues derived therefrom and from lands and other property devoted to the permanent common school fund from and after July 1, 1967; and (3) *such other sources as the legislature may direct.* That portion of the common school construction fund derived from interest on the permanent common school fund may be used to retire *such bonds as may be authorized by law* for the purpose of financing the construction of facilities for the common schools.

The interest accruing on the permanent common school fund together with all rentals and other revenues accruing thereto pursuant to subsection (2) of this section during the period after the effective date of this amendment and prior to July 1, 1967, shall be exclusively applied to the current use of the common schools.

To the extent that the moneys in the common school construction fund are in excess of the amount necessary to allow fulfillment of the purpose of said fund, the excess shall be available for deposit to the credit of the permanent common school fund or available for the current use of the common schools, *as the legislature may direct.*

§ 4 SECTARIAN CONTROL OR INFLUENCE PROHIBITED. All schools maintained or supported wholly or in part by the

public funds shall be forever free from sectarian control or influence.

§ 5 LOSS OF PERMANENT FUND TO BECOME STATE DEBT. All losses to the permanent common school or any other state educational fund, which shall be occasioned by defalcation, mismanagement or fraud of the agents or officers controlling or managing the same, shall be audited by the proper authorities of the state. The amount so audited shall be a permanent funded debt against the state in favor of the particular fund sustaining such loss, upon which not less than six per cent annual interest shall be paid. The amount of liability so created shall not be counted as· a part of the indebtedness authorized and limited elsewhere in this Constitution.

(Italics mine.)

Section 1 states the reason and purpose for the adoption of the provision. The codifier rightly entitled it the preamble. A preamble is a clause at the beginning of a constitution or statute explanatory of the reasons for its enactment and the objects sought to be accomplished. Black's Law Dictionary 1339 (4th ed. rev. 1968). Such statements are not intended to and do not create legal obligations, being but guides to the intentions of the framers. *Operating Eng'rs, Local 286 v. Sand Point Country Club,* 83 Wn.2d 498, 519 P.2d 985 (1974).

The source of the statement that "[i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex" can be found in the Enabling Act § 4, Fourth and §§ 10–11; and in Const. art. 26, Fourth (Compact with the United States). In these provisions, the people of the state were enjoined and agreed to make provision for the establishment of systems of public schools free from sectarian control, which should be open to all the children of the state, and to protect the lands granted for common school purposes. A reading of the article as a whole will reveal that the primary concern of the people was to provide for a common school fund, the sources of that fund (including

the granted land) being enumerated in the article. It was also their purpose to require the legislature to provide a uniform school system, in accordance with their agreement with the United States. This has been done. *Newman v. Schlarb,* 184 Wash. 147, 50 P.2d 36 (1935).

It is evident that when the people spoke of the paramount duty of the *state* to make ample provision for the education of all children residing within its borders, they were speaking of their own duty. If that duty was not fulfilled by the provisions of the article, it is perhaps their duty to make further provision through their legislature. But it is a moral or social duty, and not one which is enforceable by the courts.

Throughout the article, the legislature's participation in the funding of schools is spoken of in discretionary, permissive terms. "The legislature may make further provisions for enlarging said fund." "The sources of said fund shall be: . . . (3) such other sources as the legislature may direct." "To the extent that the moneys in the common school construction fund are in excess of the amount necessary to allow fulfillment of the purpose of said fund, the excess shall be available for deposit . . . or . . . current use of the common schools, as the legislature may direct."

The article does not purport to deal with the raising of tax revenues for the current support of common schools, and it empowers, rather than directs, the legislature to supplement the common school fund. How then can it be construed to impose upon the legislature a mandatory affirmative duty to levy taxes and appropriate money for the support of the schools?

The constitution does not impose upon the legislature a duty to support the public schools at any particular level. Nor does it require the legislature to provide the entire support for such schools. To find such a requirement would be to ignore the provisions of Amendments 14 and 27, providing for the levying of excess taxes and the incurring of indebtedness by school districts.

That the legislature has a duty to provide support for schools, as well as other state institutions, agencies and departments, I would not question. But the manner in which and the extent to which it will perform that duty is a matter within its discretion, for the exercise of which it is accountable only to the people.

It is significant to note that article 9 was amended in 1965, at a time when the "system" of financing schools was the same as it is now, and yet the people did not see fit to "clarify" the preamble by expressly requiring the legislature to levy taxes and appropriate funds sufficient to finance the educational program prescribed by state law at the state level or at any other level. One must conclude that it has never been their intent to impose such a duty.

For another reason, I cannot believe that the people, in adopting this article, ever conceived that they were creating a legislative duty which would be judicially enforceable. The state was, under the same document (Const. art. 2, § 26), made immune from the suit without its consent, and the immunity to the legislature to this date has not been removed.[26]

### SEPARATION OF POWERS

For still another reason, the notion that judicial enforcement of a legislative duty was intended is unacceptable. As the majority opinion makes clear by its struggle with the terms which it finds itself called upon to define, the language of the provision is not amendable to judicial interpretation. The words "education" and "ample" are both capable of broad or narrow meaning, depending upon the viewpoint of the user. Also, the content of both is apt to change with changing times. Both cry out for the exercise of legislative wisdom and discretion.

The majority sees that the word "education" is so broad that the imposition of a mandatory duty to support a complete education would be intolerable. By judicial fiat, it

---

[26]As justice would have it, neither can the legislature bring suit.

adds an adjective and narrows the meaning to something which it deems manageable.

Having decided that the term "education" as used in Const. art. 9, § 2, is a narrow one, actually meaning only "basic education," the majority has next found it necessary to provide the legislature with guidelines to aid that body in deciding what courses it will have to fund. Apparently the majority deems this kind of guidance necessary because there is no commonly accepted notion of what constitutes a "basic education," just as there is no commonly accepted notion of what comprises an "education."

The legislature, of course, has not been inattentive to the question of what constitutes an education, as a glance at RCW 28A.05 will show. Its sense of values does not exactly coincide with that of the majority of the court. Both accept the importance of education for citizenship. Both would go "beyond mere reading, writing and arithmetic." However, where the justices are concerned with preparation for competition "in today's market as well as in the market place of ideas," the legislature is more concerned with moral, ethical and human values. RCW 28A.05.010 provides, in part:

> All teachers shall stress the importance of the cultivation of manners, the fundamental principles of honesty, honor, industry and economy, the minimum requisites for good health including the beneficial effect of physical exercise, and the worth of kindness to all living creatures.

The majority, as I understand its guidelines, would include vocational training in basic education. The legislature sees such training as an option to offer students and provides for it at some length in RCW 28C.04. I assume this act will now be regarded, at least in some quarters, as unconstitutional, since vocational education is clearly designed to enable one to compete in the labor market (a basic educational goal, according to the majority) but the legislature has not seen fit to make it compulsory or define it as "basic."

I will be interested to see what the legislature will do with the concept of education for competition "in the market place of ideas" if it chooses to do anything at all with it. To fit one out for such a project could be a simple matter of teaching him to read, if his natural endowments are sufficient to enable him to take it from there, or it could entail intensive remedial training for the child having learning disabilities or limited intelligence, with little prognosis for success. I would venture to guess that the number of children who wish to prepare themselves to compete in the marketplace of ideas is somewhat limited, and that if they are given the tools for learning, those who have this bent will pursue it independently without the need of special courses in the art of idea competition.

If I were making up the categories, I would be inclined to take "idea competition" out of the "basic" column and move it over to the "enrichment" column, and replace it with literature or geography or science. Moreover, if I were viewing the question as one of what is "desirable," I would think that some exposure to all fields of learning would be beneficial to enable a child to discover his talents and interests.

I do not, however, conceive it to be my duty or my right to make these educational judgments. That function resides across the street in the legislative building, the people not having seen fit (and wisely so) to attempt to prescribe the scope of education for future generations.

It should be apparent that flexibility in the choice of educational programs and legislative discretion in the funding of them are necessary if the best interests of the children of this state and the people as a whole are to be served. And yet the majority would impose upon one legislature the duty to define the requirements of a "basic education" (subject to court approval, it seems, in some future litigation invited by the majority opinion) and to bind future legislatures to the supporting of that package. I can see no useful purpose to be served by all of this. The school financing problem is vastly more complicated than the mere

designation and funding of a minimum program. It is not within the expertise of the court to comprehend its complexities nor has it the necessary time to devote to the project if it is to give proper attention to the truly justiciable cases which come before it. Neither has it the facilities to acquire the knowledge which would support an intelligent judgment.

The trial of the "factual issues" in this case was a lengthy one and was more in the nature of a legislative hearing than a judicial inquiry. It suffered from disadvantages not found in the legislature. Its scope was controlled by the litigants and their counsel, who selected the witnesses, whereas anyone may present his evidence and his views to the legislature. While the trial may have consumed more time than any legislative hearing in history, that was not necessarily an advantage. There was time enough to forget and perhaps to grow bored. And finally, the decision was not made upon the collective judgment of the representatives of the people, but by a single judge. I am certain that such an eventuality was never conceived or intended by the framers of article 9. I do not believe that the people of this state today, if they understand the full import of the court's action, would give it their approval.

### THE QUESTION OF LEGISLATIVE AUTONOMY AND LIMITATIONS UPON THE JUDICIAL POWER

The majority opinion in this case is a gratuitous one, given with respect to a matter entrusted by the constitution to the wisdom and discretion of the legislature. It is nothing more than this, because there is no justiciable controversy before us. No statute passed by the legislature has been challenged in this action and none has been found invalid. The court issues no order. True, an opinion is voiced regarding the legislature's affirmative duty with respect to the financing of schools. That opinion is such that it necessitates a further expression of opinion as to the most desirable school subjects to be prescribed and funded by the legislature. I submit that the members of the legislature are

in no wise obliged to accept this opinion as a "guideline" in prescribing the courses to be studied in the public schools or in allocating the proceeds of tax revenues among the various state agencies and institutions which, under the constitution, it is called upon to support.[27]

To understand the impropriety of the court's action in entertaining this case, it is necessary to consider what the court is asked to do. There is no contention here that the legislature has passed a law which is repugnant to some provision of the constitution and which violates a right of any plaintiff in this action. Nor is it suggested that any of the named defendants have taken some action which injured the plaintiffs. The sum and substance of the complaint is that the funds made available by the State are inadequate to finance the activities of the plaintiff school district, and the district has found itself obliged to ask the voters within its boundaries to supplement these funds by authorizing excess levies.

It is not suggested that there are funds in the state treasury which have been wrongfully withheld and which rightfully belong to the district. In that event the State

---

[27]See *In re Juvenile Director*, 87 Wn.2d 232, 248, 552 P.2d 163 (1976). Speaking of its reluctance to compel expenditures of state funds for its own support, the court said, in an opinion written by Justice Utter:

By its nature, litigation based on inherent judicial power to finance its own functions ignores the political allocation of available monetary resources by representatives of the people elected in a carefully monitored process. *See generally Baker v. Carr*, 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962); *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964); *Mahan v. Howell*, 410 U.S. 315, 35 L. Ed. 2d 320, 93 S. Ct. 979 (1973); *Gaffney v. Cummings*, 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973). Supreme Courts, obviously, are not composed of judges elected in a proportionally representative manner. The unreasoned assertion of power to determine and demand their own budget is a threat to the image of and public support for the courts. In addition, such actions may threaten, rather than strengthen, judicial independence since involvement in the budgetary process imposes upon the courts at least partial responsibility for increased taxes and diminished funding of other public services. Those groups whose interests are adversely affected, legitimately may respond with standard political sanctions, including threats of impeachment, tighter control over judicial selection, and opposition to the individual judge who initiates budgetary intervention.

Treasurer might be suable. Nor is it suggested that the Superintendent of Public Instruction or the Speaker of the House of Representatives or the President of the Senate is withholding funds rightfully due the plaintiff.

The real and only party against whom relief is demanded is the legislature and that body is one which is not amenable to suit. I think it should be unnecessary to explore all of the reasons for this. It should be enough to note that the people have seen fit to protect the members of their legislature from harassment by litigants while they are in session (Const. art. 2, § 16). *Seamans v. Walgren,* 82 Wn.2d 771, 514 P.2d 166 (1973). When they are not in session, they are not a legislature.

The legislature is not a corporate body, and its officers are not authorized to accept service on behalf of their fellow members. Furthermore, it is contrary to the nature of our representative form of government to permit interference by the court with the internal functioning of the legislature. I would venture to say that the legislature is as immune from suit as this court, in the performance of its constitutional duties, is immune from legislative investigation—and that, of course, means totally immune.

The principle upon which these immunities are founded is that the three branches of government are independent of each other and enjoy a separate autonomy in the performance of their constitutional duties. It was well stated by Judge Hoyt in *State ex rel. Reed v. Jones,* 6 Wash. 452, 462, 468, 34 P. 201 (1893), explaining the reasons why the court will presume that an enrolled bill was duly and regularly enacted. Speaking of the various mandatory duties imposed by the constitution upon the executive and legislative branches, he said:

> To preserve the harmony of our form of government it must be held that these several mandatory provisions are addressed to the department which is called upon to perform them, and that neither of the other departments can in any manner coerce that department into obedience thereto. . . .

. . .

. . . Much less evil will grow out of a course of decision which will give the people to understand that the legislative is a department of the government of as high authority as the judicial, and that with the mandatory provisions directed to it the other departments of the government have no concern. When this is once well understood the people will see to it that such mandatory provisions are complied with by the legislature, or if they do not, the blame must rest upon themselves of [sic] the system of government which has as its basis the equal authority of the three departments into which it is divided.

The action which the court was asked to take in that case was much less oppressive than that which the plaintiffs would have the court take here. There the court was merely asked to invalidate a statute passed by the legislature. Here the relief sought amounts to no less than a directive to the members of the legislature to vote, not according to their consciences or the wishes of their constituents, but according to the judgment of the majority of this court, which happens to coincide with the wishes of the plaintiffs.

I wish I could say that no court has ever gone so far. Certainly the United States Supreme Court has not done so, even though in *Powell v. McCormack,* 395 U.S. 486, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969), it came dangerously close. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803), and *Baker v. Carr,* 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962), heavily leaned upon by the majority, were both cases in which the court declared statutes unconstitutional. In *Powell,* a congressional resolution was declared null and void. Even there no affirmative relief was granted and no future duty was imposed upon the legislative branch. In none of these did the court presume to tell a legislative body what the content of its enactments should be.

In 1973, the New Jersey Supreme Court, much like the majority here, set itself up to determine what constitutes a "thorough and efficient" education. *Robinson v. Cahill,* 62

N.J. 473, 303 A.2d 273 (1973). That court's adventures with the legislature, which inevitably followed this usurpation of legislative prerogative, are chronicled in *Robinson v. Cahill,* 63 N.J. 196, 306 A.2d 65 (1973); *Robinson v. Cahill,* 67 N.J. 35, 335 A.2d 6 (1975); *Robinson v. Cahill,* 67 N.J. 333, 339 A.2d 193 (1975); *Robinson v. Cahill,* 69 N.J. 449, 355 A.2d 129 (1976); *Robinson v. Cahill,* 70 N.J. 155, 358 A.2d 457 (1976) and *Robinson v. Cahill,* 70 N.J. 464, 360 A.2d 400 (1976).

The New Jersey litigation demonstrates the propriety and efficacy of the principle that a court should not, under the guise of constitutional interpretation, presume to lay down guidelines or ultimatums for legislatures.

### JUSTICIABILITY

Not only is the real defendant not before the court in this suit and in any event not amenable to its decrees, but the court is also asked to enter upon policy determinations for which there are no judicially manageable standards. Without such standards, a case is not justiciable.

In deciding generally whether a claim is justiciable, a court must determine "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker v. Carr, supra* at 198; *Powell v. McCormack, supra.*

The court is asked to say to the legislature that it is required under the constitution to fund a certain level of education in the public schools of the state. Where are the standards for determining that level? All we are given is the word "ample" and unless the court can define education, it cannot begin to determine what is ample provision for education. Furthermore, what is "ample" is another question calling for subjective and discretionary judgment.

Aside from the impossibility of enforcing any decree against the legislature, without the court itself violating the constitution in the process, there is simply no way this court can decide what the legislature's duty is, assuming

the framers meant to impose one upon it. What constitutes a basic or a good or an adequate education are all questions which are open to extensive debate, and the proper place to debate such questions is before and within the legislature. This court has not the facilities for acquiring the necessary knowledge to make an informed judgment on the subject, nor is it constitutionally endowed with that function.

The majority tacitly acknowledges that it cannot resolve this problem. It leaves it to the legislature, appealing to the good faith of its members to save its face and relieve it of the necessity of fashioning relief. This procedure is what Justice Clark, concurring in *Baker v. Carr, supra* at 260, aptly called "blackjacking" the legislative body. Of course, in the redistricting cases, the legislatures generally refused to be blackjacked and the end result was that federal courts found themselves faced with the necessity of either acknowledging the impotence of their judgments or themselves performing the legislative task of redistricting. That may well be the eventual fate of this court.

The majority cites *State ex rel. Distilled Spirits Inst., Inc. v. Kinnear,* 80 Wn.2d 175, 492 P.2d 1012 (1972), as a precedent for its action here. That was a taxpayer's suit brought to test the constitutionality of a tax statute which was passed after midnight of the 60th day of an extraordinary session of the legislature. While we recognized that the case would ordinarily be controlled by the principle that the court will not look behind an enrolled bill to inquire into the regularity of the proceedings by which it was enacted, we rendered a "declaratory judgment" which was in point of fact an advisory opinion[28] to resolve a question upon which there was general uncertainty and with respect to which the legislature was in need of and desired an answer.

[28]*See Citizens Council Against Crime v. Bjork,* 84 Wn.2d 891, 894, 529 P.2d 1072 (1975), for an express acknowledgment of this fact. That case resulted in an advisory opinion, given to accommodate the Governor, who had intervened.

We noted that not only were the parties and the public concerned about the interpretation of the constitutional provision governing the sessions of the legislature, but the Governor and the legislature itself, though of course not parties to the action, were desirous of such an interpretation. The legislature's dilemma had been manifested over the years by its recurrent practice of stopping the clock at midnight on the 60th day of the session, in order to finish its urgent business at hand. In deciding to render an opinion, we were particularly moved by the fact that our interpretation was one which would *liberate,* rather than restrict, the legislature in the performance of its duties.

After observing that we had been warned of no evil consequences which might follow from the rendering of an opinion upon the meaning of the constitutional provision in question, we said:

> On the other hand, such an opinion will serve to remove doubts concerning the validity of a number of important legislative acts passed not only in this session but in previous sessions. And since our understanding of the constitution is that it does not in fact restrict the legislature as severely as has been feared, an opinion upon the subject should serve to relieve the legislative body from the necessity of resorting to artifice in order to obtain the time necessary for it to enact the legislation which it finds imperative for the welfare of the state.

*State ex rel. Distilled Spirits Inst. v. Kinnear, supra* at 178. We held that the constitution does not limit the duration of extraordinary sessions of the legislature.

Of course, the opinion which we rendered was not binding on the legislature. That body was still free to stop the clock on the 60th day or not, as it chose. The opinion merely gave it a theory under which it could feel justified in abandoning that embarrassing practice.

Important factors which were present in *Distilled Spirits* are absent here. The fact that we are not asked to declare any law unconstitutional is not a significant distinction. The alleged invalidity of the law there was not in its substance but in the procedure by which it was enacted, and

the court was asked to disregard the autonomy of the legislature in making its inquiry. The important distinctions include the following: The legislature itself was in doubt as to the restrictions placed upon it by the constitution and desired a judicial interpretation, and the opinion given by the court served to liberate, rather than to burden, the legislature. The case involved no necessity or possibility of judicial usurpation of the legislative function. In fact the court was not called upon to "fashion a remedy" of any kind. The opinion did not lay open a new area for future litigation. Instead, it closed off an avenue of challenge to legislative acts. In short, the opinion actually enhanced the autonomy of the legislature, rather than invaded it.

It may be asked, What if the court had construed the constitution as limiting extraordinary sessions to 60 days? Would it then have struck down all laws passed after midnight on the 60th day? The answer to that question must be no. We might have given an advisory opinion to that effect, but any examination into the actual practice of the legislature was precluded under the enrolled bill doctrine.

Here there is no suggestion that the legislature, prior to 1974, had ever been in doubt regarding its duties under Const. art. 9. Doubts as to the meaning of that provision arose only as a product of the ingenuity of counsel, who, when equal protection arguments which had been put forth to invoke judicial intervention in school financing problems failed at the Supreme Court level (*San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973)), discovered in the preamble language which might be dangled before the judicial nose. If legislators now are in doubt as to their constitutional duties, that doubt was engendered not by their own reading of the document, but by interest groups seeking to influence legislation through the judicial process. That is not the kind of doubt which existed in the legislative mind in *Distilled Spirits.*

Where the advisory opinion given in *Distilled Spirits* was liberating, that which is rendered here imposes heavy and frustrating burdens on the legislators, if they choose to consider themselves obliged to honor it. It constitutes an interference with their exercise of independent judgment in the raising and allocation of state revenues, causing them to respond not to their consciences and their constituents, but to another department of government. For, make no mistake, the parties to this action do not constitute nor are they shown to represent the majority of the voters of this state. Our presumption must be that the majority view is exemplified by the actions or nonactions of the legislature, and as that branch has not found it wise or necessary in the past to provide the kind of funding which the court thinks it should, it must be that the majority of the people approve or acquiesce in the legislative approach to the problem.

While the majority of the court forswears any intent to enforce a judgment against the legislature, for the time being at least (undoubtedly aware of its inability to do so), it nevertheless blackjacks the legislature by means of a declaratory judgment. While I do not think that the legislature has the slightest obligation to carry out the implied directives contained in that "judgment," I imagine that an honest effort will be made to do so, with the result that its judgment will be affected by considerations which have no place in the legislative halls.

Because there is no justiciable controversy before the court; because there is no showing that the legislature has failed to perform its duty to support the public schools; because the constitution does not impose upon the legislature a judicially enforceable duty to furnish such support; because the judgment in the superior court and that of the majority here disregard the autonomy of the legislature and wrongfully intrude upon its functions; because those judgments cannot lawfully or practically be enforced, and

because they are in fact inimical to the welfare of the people of this state, I would reverse the court below and dismiss the action.

HAMILTON and HICKS, JJ., concur with ROSELLINI, J.